# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| HM ELECTRONICS, INC., <br><br> Plaintiff, <br><br> vs. <br><br> R.F. TECHNOLOGIES, INC., <br><br> Defendant. | NO. 12-CV-2884-MMA (WMC) <br><br> **ORDER GRANTING PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION** <br><br> [Doc. No. 35] |

Currently pending before the Court is Plaintiff HM Electronic Inc.'s motion for preliminary injunction against Defendant R.F. Technologies, Inc. On September 30, 2013, the Court held a hearing on the motion. Based on the parties' submissions and oral argument, the Court **GRANTS** Plaintiff's motion for preliminary injunction. Pursuant to Rule 65(d) of the Federal Rules of Civil Procedure, the Court sets forth the reasoning and terms of the preliminary injunction below.

## BACKGROUND

On December 4, 2012, Plaintiff, a California corporation, filed a complaint against Defendant, an Illinois corporation, for trademark infringement and unfair competition under federal and state law. [Doc. No. 1.]

Plaintiff and Defendant operate in the Quick Service Restaurant ("QSR")

1  Industry. [Haas Decl. ¶2; Noorian Decl. ¶2.] Plaintiff is one of three major
2  manufacturers of drive thru headsets. [Haas Decl. ¶ 18.] The other two major
3  manufacturers are 3M and Panasonic. [*Id.*] Plaintiff also sells and repairs HME drive-
4  thru headsets and other HME drive-thru products ("HME products"). [*Id.* ¶16.] New
5  HME headsets are available exclusively through Plaintiff or other authorized HME
6  distributors. All new HME headsets come with a manufacturer's warranty. [*Id.* ¶¶ 19,
7  20.] This warranty extends only to the product's original purchaser and covers only
8  repairs that are performed by an HME authorized facility. [*Id.* ¶ 20.] Any repairs to
9  HME products performed by an unauthorized facility void the manufacturer's warranty.
10 [*Id.*]

11     Defendant repairs and refurbishes drive thru headsets of various manufacturers,
12 including Plaintiff, 3M, Panasonic, and Quail. [Noorian Decl. ¶ 5.] Although
13 Defendant repairs, refurbishes, and occasionally resells HME headsets, Defendant is
14 not an authorized HME distributor or repair facility. [*See id.* ¶ 5; Haas Decl. ¶ 23.]

15 <center>**LEGAL STANDARD**</center>

16     "A preliminary injunction is an extraordinary remedy never awarded as of right."
17 *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). "A plaintiff seeking
18 a preliminary injunction must establish that he is likely to succeed on the merits, that
19 he is likely to suffer irreparable harm in the absence of preliminary relief, that the
20 balance of equities tips in his favor, and that an injunction is in the public interest." *Id.*
21 at 20.

22     In the Ninth Circuit, courts may apply a sliding scale approach in which
23 "elements of the preliminary injunction test are balanced, so that a stronger showing
24 of one element may offset a weaker showing of another." *Alliance for the Wild Rockies*
25 *v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011). For example, "a stronger showing of
26 irreparable harm to plaintiff might offset a lesser showing of likelihood of success on
27 the merits." *Id.* Additionally, a "preliminary injunction is appropriate when a plaintiff
28 demonstrates . . . that serious questions going to the merits were raised and the balance

of hardships tips sharply in the plaintiff's favor." *Id.* at 1134-35 (citing *Lands Council v. McNair*, 537 F.3d 981, 987 (9th Cir. 2008)).

Importantly, courts may deny a preliminary injunction solely on ground that the plaintiff failed to raise even "serious questions" as to the merits. *See Guzman v. Shewry*, 552 F.3d 941, 948 (9th Cir. 2009). "[A]t an irreducible minimum, the moving party must demonstrate a fair chance of success on the merits, or questions serious enough to require litigation." *Id.*; *Pimentel v. Dreyfus*, 670 F.3d 1096, 1105-06 (9th Cir. 2012).

## DISCUSSION

### A.   *Likelihood of Success on the Merits*

For the purposes of this motion, Plaintiff relies exclusively on its claims under sections 32(b) and 43(a) of the Lanham Act. [Doc. No. 35-1 at 8.]  Plaintiff seeks this injunction based on three separate alleged violations of the Lanham Act: first, Defendant resells HME products that are materially different without a disclosure in violation of section 32(b); second, Defendant falsely associates itself with Plaintiff's HME products in violation of section 43(a); and third, Defendant engages in "reverse palming off" by re-labeling HME products to pass them off as its own in violation of section 43(a).

To establish a claim under the Lanham Act, the plaintiff must show the defendant is "using a mark confusingly similar to [the plaintiff's] valid, protectable trademark." *Brookfield Commc'ns, Inc. v. W. Coast Entm't Corp.*, 174 F.3d 1036, 1046 (9th Cir. 1999); *see also Rearden LLC v. Rearden Commerce, Inc.*, 683 F.3d 1190, 1202 (9th Cir. 2012).

As a threshold matter, the parties do not dispute the first element—a valid, protectable trademark. [*See* Doc. No. 40 at 16.] The parties, however, dispute the second element—likelihood of confusion. "The 'likelihood of confusion' inquiry generally considers whether a reasonably prudent consumer in the marketplace is likely to be confused as to the origin or source of the goods or services bearing one of the

marks or names at issue in the case." *Rearden LLC*, 683 F.3d at 1209. Importantly, "because we are at the preliminary injunction stage, [the plaintiff] must establish that it is likely to be able to show a likelihood of confusion." *Brookfield*, 174 F.3d at 1052 n.15.

Because Plaintiff alleges three distinct violations of the Lanham Act, the Court addresses the likelihood of confusion as to each alleged violation separately.

### *1.    Defendant's Resale of HME products*

Plaintiff alleges that Defendant's unauthorized re-sale of HME products violates section 32(b) of the Lanham Act. Plaintiff contends that because the HME products resold by Defendant do not come with a manufacturer's warranty, the products are materially different and are likely to cause consumer confusion.

Courts generally apply the first sale doctrine to the resale of trademarked goods. *See Sebastian Int'l, Inc. v. Longs Drug Stores Corp.*, 53 F.3d 1073, 1076 (9th Cir. 1995). This doctrine limits the trademark owner's right under the Lanham Act to control distribution of its own products after the product's first sale. *Enesco Corp. v. Price/Costco Inc.*, 146 F.3d 1083, 1085 (9th Cir. 1998). Under this doctrine, a purchaser may "stock, display, and resell a producer's product under the producer's trademark" without infringing on the producer's trademark. *Sebastian*, 53 F.3d at 1076. "After that first sale, however, the trademark holder may establish infringement only if he demonstrates that the goods are materially different." *Grateful Palate, Inc. v. Joshua Tree Imports, LLC*, 220 F. App'x 635, 637 (9th Cir. 2007); *see also SoftMan Products Co., LLC v. Adobe Sys., Inc.*, 171 F. Supp. 2d 1075, 1092 (C.D. Cal. 2001). The resale of a materially different product constitutes trademark infringement because the product is not genuine and may cause confusion regarding the product's source or quality. *See Enesco*, 146 F.3d at 1087; *see also Davidoff*, 263 F.3d at 1302 ("[M]aterially different products that have the same trademark may confuse consumers and erode consumer goodwill toward the mark."). "A guiding principle in evaluating whether a difference between two products bearing the same trademark is material is

1  whether the difference confuses consumers and impinges on the trademark holder's
2  goodwill." *Beltronics USA, Inc. v. Midwest Inventory Distrib., LLC*, 562 F.3d 1067,
3  1073 (10th Cir. 2009) (internal citation and quotation omitted); *see also Davidoff*, 263
4  F.3d at 1302 ("A material difference is one that consumers consider relevant to a
5  decision about whether to purchase a product."); *Iberia Foods Corp. v. Romeo*, 150
6  F.3d 298, 303 (3d Cir. 1998) (distinguishing a material difference from a difference in
7  which the customer still "gets precisely what they believed they were purchasing").

8      Differences in warranties or services accompanying a trademarked product may
9  constitute material differences. *See, e.g.*, *Beltronics*, 562 F.3d at 1073 (finding no error
10 in the district court's conclusion that "material differences may include warranties and
11 services associated with [a trademarked product]"); *SKF USA Inc. v. Int'l Trade*
12 *Comm'n*, 423 F.3d 1307, 1312 (Fed. Cir. 2005) (holding "physical material differences
13 are not required to establish trademark infringement involving gray market goods");
14 *Societe Des Produits Nestle, S.A. v. Casa Helvetia, Inc.,* 982 F.2d 633, 644 n.7 (1st Cir.
15 1992) ("[T]he appropriate test should not be strictly limited to physical differences.
16 Other sorts of differences—differences in, say, warranty protection or service
17 commitments—may well render products non-identical in the relevant Lanham
18 Trade–Mark Act sense."); *Hokto Kinoko Co. v. Concord Farms, Inc.*, 810 F. Supp. 2d
19 1013, 1026 (C.D. Cal. 2011) (finding material differences in warranty, customer
20 support, and labeling information support a high likelihood of confusion); *Dell, Inc.*
21 *v. This Old Store, Inc.*, No. 07cv0561, 2007 WL 2903845 (S.D. Tex. Oct. 3, 2007) ("It
22 is a question of fact whether the absence of a warranty renders the resold product
23 'materially different.'").

24     Although the HME products themselves may not appear tangibly different, the
25 fact that a manufacturer's warranty comes with Plaintiff's sale but not Defendant's
26 resale of HME products is likely to confuse consumers. Plaintiff has submitted
27 evidence demonstrating that customers have been confused as to whether the HME
28 manufacturer's warranty covers their "new" HME products sold by Defendant. [Haas

Decl. ¶ 13.] Further, the fact that Defendant does not disclose that its products do not come with the HME manufacturer's warranty may exacerbate the potential for customer confusion. *See Beltronics*, 562 F.3d at 1074 ("So long as resellers of materially different products take the necessary steps to adequately alleviate this confusion and prevent injury to the trademark's goodwill—by, for example, sufficiently disclosing that the product differs from the originally sold product—those differences will be unlikely to trigger the liability [the defendant] envisions."); *see, e.g.*, *Enesco*, 146 F.3d at 1086 (holding a purchaser could repackage and sell trademarked figurines as long as the purchaser disclosed to the public that it repackaged the original product).

Because the difference in warranties accompanying Plaintiff's and Defendant's sale of HME products may be material, the Court finds that Plaintiff has demonstrated "it is likely to be able to show a likelihood of confusion" as to the source or origin of the new HME products sold by Defendant. *See Brookfield*, 174 F.3d at 1052 n.15. Accordingly, Plaintiff has demonstrated serious questions as to the merits of the section 32(b) claim.

### 2. *Defendant's False Association*

Plaintiff contends that Defendant falsely associates itself with Plaintiff in violation of section 43(a) of the Lanham Act. [Doc. No. 35-1 at 5; Doc. No. 43 at 5.] Plaintiff alleges that Defendant uses a mark similar to Plaintiff's trademark throughout Defendant's marketing, which falsely suggests an affiliation with Plaintiff. [Doc. No. 35-1 at 10-11.] Specifically, Plaintiff claims that Defendant advertises itself as an "HME Nationwide Repair Center" when it is not, and claims to sell new HME equipment. [*See* Haas Decl. Exh. 5, 6, 11-14.]

To determine the likelihood of confusion, courts employ the eight-factor test known as the "*Sleekcraft* Factors." *GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1205 (9th Cir. 2000). These factors include (1) the similarity of the marks; (2) the relatedness of the two companies' goods; (3) the marketing channel used; (4) the

strength of the mark; (5) defendant's intent in selecting its mark; (6) evidence of actual confusion; (7) the likelihood of expansion into other markets; and (8) the degree of care likely to be exercised by purchasers. *Id.; see also AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341 (9th Cir. 1979), abrogated on other grounds by *Mattel, Inc. v. Walking Mountain Prods.*, 353 F.3d 792 (9th Cir. 2003). The Ninth Circuit considers the first three factors—similarity of the marks, relatedness of goods, and use of a common marketing channel—the most important when determining a likelihood of confusion. *See GoTo.com*, 202 F.3d at 1205; *Brookfield*, 174 F.3d at 1054.

### a. The Similarity of the Marks

Courts must examine the marks in their entirety—including appearance, sound and meaning—and as consumers encounter the marks in the marketplace. *GoTo.com*, 202 F.3d at 1206; *CytoSport*, 617 F. Supp. 2d at 1067. "Obviously, the greater the similarity between the two marks at issue, the greater the likelihood of confusion." *Id.*

Plaintiff's trademark is "HME," the company's initials in white capital letters, bold font, and positioned within a dark blue rectangle. [*See* Haas Decl. Exh. 1.] Defendant uses various marks in relation to its HME products. At times, Defendant's mark is virtually identical to Plaintiff's trademark: the capital letters "HME" in white, bold font within a blue rectangle. [*See* Haas Decl. Exh. 5.] The only distinction between this mark and Plaintiff's trademark is that Defendant's rectangle is slightly bigger and appears in various dark colors. [*See id.*; Haas Decl. Exh. 6.] Other times, Defendant's mark is still the capital letters "HME" in a dark color and appears either on its own or within a circle. [*See* Haas Supp. Decl. Exh. 16; Noorian Decl. Exh. A.] Even considering these slight differences in appearance, the marks still sound the same and have the same meaning. Accordingly, the Court finds a high similarity of the marks. This factor strongly supports a likelihood of confusion.

### b. The Relatedness of the Two Companies' Goods

The public is more likely to associate two companies when they compete directly. *See Brookfield*, 174 F.3d at 1054. Defendant claims that "the parties do not

mainly compete in the same market." [Doc. No. 40 at 21.] The Court finds this argument unavailing. Both companies repair and sell headset equipment in the QSR industry. Plaintiff manufacturers, sells, and repairs its own HME drive thru headset products. Defendant repairs, refurbishes, and occasionally resells HME equipment. [Noorian Decl. ¶ 8.] This factor also strongly supports a likelihood of confusion.

### c. The Marketing Channel Used

"[C]onvergent marketing channels increase the likelihood of confusion." *CytoSport*, 617 F. Supp. 2d at 1069 (quoting *AMF*, *Inc.*, 599 F.2d at 353). Here, Defendant admits that both parties utilize an online website to market their products and services. *See Brookfield*, 174 F.3d at 1057 (noting the fact that both parties "utilize the Web as a marketing and advertising facility" may exacerbate the likelihood of confusion). Additionally, Defendant admits that Plaintiff and Defendant market to the same purchasers within what it deems "a highly sophisticated and narrow Quick Service Restaurant Industry." Because both the marketing channel and the consumers are the same, this factor supports a likelihood of confusion.

### d. The Strength of the Mark

"The stronger a mark—meaning the more likely it is to be remembered and associated in the public mind with the mark's owner—the greater the protection it is accorded by the trademark laws." *Brookfield*, 174 F.3d at 1058. Two indications of a mark's strength are conceptual and commercial strength. *Network Automation, Inc. v. Advanced Sys. Concepts*, 638 F.3d 1137, 1149 (9th Cir. 2011) (internal quotations and citation omitted). Conceptual strength involves classifying a mark "along a spectrum of generally increasing inherent distinctiveness as generic, descriptive, suggestive, arbitrary, or fanciful." *Id.* In making this determination, "[i]f a consumer must use more than a small amount of imagination to make the association, the mark is suggestive and not descriptive." *CytoSport*, 617 F. Supp. 2d at 1070 (citing *Rodeo Collection, Ltd. v. West Seventh,* 812 F.2d 1215, 1218 (9th Cir. 1987)). Commercial strength is based on "actual marketplace recognition," and thus "advertising

expenditures can transform a suggestive mark into a strong mark." *Brookfield*, 174 F.3d at 1058.

Defendant contends that the HME mark is a weak, descriptive mark without secondary meaning, and therefore it is not entitled to protection. [Doc. No. 40 at 20.] Plaintiff asserts the HME mark has commercial strength. As explained above, Plaintiff's "HME" mark is the company's initials. The mark is suggestive because from the mark itself, the consumer must use its imagination to associate HME with its products. *See Brookfield*, 174 F.3d at 1058 (finding the plaintiff's mark was "suggestive—and thus strong enough to warrant trademark protection—because it requires a mental leap from the mark to the product"). Additionally, the mark has commercial strength because the HME mark "has achieved actual marketplace recognition." *See id.* As both Plaintiff and Defendant acknowledge, Plaintiff is only one of three major manufacturers within the QSR Industry and given this "narrow" market, Plaintiff's mark has recognition among its QSR consumer base.

Moreover, even if the Court finds Plaintiff's mark is weak, the Ninth Circuit has recognized that where the products involved are closely related and the mark is identical, whether a mark is weak is of little importance. *Brookfield*, 174 F.3d at 1059 (internal citation omitted).

### e. Defendant's Intent in Selecting its Mark

The Ninth Circuit has emphasized "the minimal importance" of this factor because trademark infringement does not require an intent to confuse customers. *GoTo.com*, 202 F.3d at 1208. However, where an infringer "adopts his designation with the intent of deriving benefit from the reputation of the trade-mark or trade name, its intent may be sufficient to justify the inference that there are confusing similarities." *Brookfield*, 174 F.3d at 1059.

Defendant operates in the same QSR industry and uses a mark virtually identical to Plaintiff's HME trademark. In some instances, Defendant places its mark right next to "Nationwide Repair Center" or the words "HME systems, parts, and accessories"

[*See* Haas Decl. Exh. 5.; Noorian Decl. Exh. A.] In adopting a virtually identical mark and placing it next to "Nationwide Repair Center" or "HME systems, parts, and accessories," Defendant intends to reap the benefits of consumers' associating it with Plaintiff. *See Brookfield*, 174 F.3d at 1059. Accordingly, this factor supports a likelihood of confusion.

### *f. Evidence of Actual Confusion*

"Evidence of actual confusion is strong evidence that future confusion is likely." *Official Airline Guides, Inc. v. Goss*, 6 F.3d 1385, 1393 (9th Cir. 1993) (internal citation omitted). In the Ninth Circuit, district courts often rely on three types of evidence to demonstrate actual confusion: "(1) evidence of actual instances of confusion; (2) survey evidence; and (3) inferences arising from judicial comparison of the conflicting marks and the context of their use in the marketplace." *CytoSport,* 617 F. Supp. 2d at 1073 (internal citation omitted).

Plaintiff has submitted evidence of actual instances of consumer confusion. For example, a customer called Plaintiff to inquire about the status of a repair, believing she had sent Plaintiff the HME headset. After investigating the claim, Plaintiff discovered that the customer had actually sent the headset to Defendant for repairs. [Haas Decl. ¶ 31.] The fact that the customer believes Plaintiff is repairing the product, even after mailing the product to Defendant, shows actual consumer confusion. Mr. Haas states this situation has occurred with multiple customers, and the customers often indicate they believed Defendant was an HME authorized repair facility. [*Id.* ¶ 32.]

Upon the Court's own review of the images of Defendant's website submitted by both Plaintiff and Defendant, the inferences that arise support actual consumer confusion. On the "HME Repairs" page, Defendant includes the capital letters "HME" in white, bold font within a blue rectangle—a mark virtually identical to HME's trademark—and places it immediately before the phrase "Nationwide Repair Center." [*See* Haas Decl. Exh. 5.] The only inference arising from this page is that RFT is a nationwide repair center authorized by HME. Accordingly, this inference also supports

actual consumer confusion. The Court finds this factor weighs in favor of a likelihood of confusion.

### g. The Likelihood of Expansion into Other Markets

When two companies already directly compete, the likelihood of expansion into other markets is relatively unimportant. *Brookfield,* 174 F.3d at 1060; *see also GoTo.com*, 202 F.3d at 1209 (declining to evaluate the issue of whether there is a likelihood of expansion of their product lines because the parties already compete). As explained above, Plaintiff and Defendant are already in the same "narrow" industry and compete directly for sales and repairs of HME products. Accordingly, this factor does not weigh in either party's favor. *See CytoSport*, 617 F. Supp 2d at 1076 (finding this factor did not favor either party because products offered are substitute products).

### h. The Degree of Care Exercised by Purchasers

In determining the degree of care that purchasers likely exercise, courts apply the standard of "the typical buyer exercising ordinary caution." *AMF, Inc.*, 599 F.2d at 353 (internal citations omitted). "What is expected of this reasonably prudent consumer depends on the circumstances." *Brookfield*, 174 F.3d at 1060. The Ninth Circuit has provided the following guidance regarding the "reasonably prudent consumer":

> We expect him to be more discerning—and less easily confused—when he is purchasing expensive items, and when the products being sold are marketed primarily to expert buyers. . . We recognize, however, that confusion may often be likely even in the case of expensive goods sold to discerning customers. On the other hand, when dealing with inexpensive products, customers are likely to exercise less care, thus making confusion more likely.

*Id.* (internal citations and parentheticals omitted).

Defendant contends that the applicable standard is that of a sophisticated consumer because predominantly restaurant operators and managers purchase HME products, not the average consumer. Defendant asserts their QSR consumers are familiar with the three major manufacturers and understand the mechanics of the headset products. Accordingly, as sophisticated consumers, they are more likely to exercise a fair degree of care in purchasing drive thru headsets.

The Court agrees with Defendant. The products at issue are headsets specifically designed for use in a drive thru restaurant. Although an individual headset may not be an expensive purchase within the business context,[1] the headsets are an integral aspect of the consumer's business and therefore an important purchase. Accordingly, the Court should find consumers are likely to exercise more care than the average consumer. This factor therefore weighs against finding a likelihood of confusion. However, even though this factor favors Defendant, it is not sufficient to overcome the likelihood of confusion strongly established by the other factors. *See Brookfield*, 174 F.3d at 1060.

The Court finds that Plaintiff has established "it is likely to be able to show a likelihood of confusion" regarding Defendant's use of a similar mark that suggests a false affiliation with Plaintiff. *See Brookfield*, 174 F.3d at 1052 n.15. Accordingly, Plaintiff has demonstrated serious questions as to the merits of this claim.

### 3. *Defendant's Re-labeling HME Products*

Plaintiff contends that Defendant re-labels HME products to pass them off as Defendant's products in violation of section 43(a) of the Lanham Act. In particular, Plaintiff alleges that when repairing HME headset products, Defendant removes the product's distinctive HME branded outer casing and eliminates the HME serial number and other HME-identifying information. [Haas Decl. ¶ 29, Exh. 8.] Defendant then replaces the outer casing with a virtually identical casing that bears Defendant's logo, even though at times the product's circuit board and electronic components remain HME components. [*Id.* ¶¶ 25, 29.] Finally, Defendant reattaches HME's Federal Communication Commission ("FCC") number to the product now bearing Defendant's logo. [*Id.* ¶ 29.] Plaintiff asserts that this year alone, it has received for repair approximately 60 HME headsets re-cased and re-labeled with Defendant's logo. [*Id.* ¶ 30.]

---

[1] Based on the quote that Defendant provided to a customer, two headsets are $825 for "sell" and $1,650.00 for "extended." [Haas Decl. Exh. 14.]

1    "Reverse palming off" occurs when a company obtains a trademarked good,
2    removes the trademark owner's name, and then markets the product under its own
3    name. *Summit Mach. Tool Mfg. Corp. v. Victor CNC Sys., Inc.*, 7 F.3d 1434, 1437
4    (9th Cir. 1993). Reverse palming off also includes selling "another's product that
5    has been slightly modified and then labeled with a different name." *Id.* (citing
6    *Roho, Inc. v. Marquis*, 902 F.2d 356, 359 (5th Cir. 1990)). As the Ninth Circuit
7    explained, reverse palming off is wrongful because "the originator of the
8    misidentified product is involuntarily deprived of the advertising value of [his]
9    name and the goodwill that otherwise would stem from public knowledge of the true
10   source of the satisfactory product." *Id.* (citing *Lamothe v. Atlantic Recording Corp.*,
11   847 F.2d 1403, 1406-07 (9th Cir. 1988)). Additionally, this conduct leads to
12   consumer confusion because the consumer "is also deprived of knowing the true
13   source of the product and may even be deceived into believing that it comes from a
14   different source." *Id.*

15   Defendant's re-labeling fits squarely within the Ninth Circuit's definition of
16   "reverse palming off." *See Summit*, 7 F.3d at 1437. Moreover, Plaintiff has
17   submitted evidence to show that Defendant's re-labeling of HME products has
18   caused actual consumer confusion. The declaration of Mr. Haas describes an
19   instance in which a customer obtained a headset from Defendant. Although the
20   headset appeared as Defendant's product—with new case parts, boom and key pad
21   bearing Defendant's logo—the headset's main circuit board remained an HME
22   product. [Haas Decl. ¶ 25.] In other instances, customers believed they had
23   purchased new HME headsets only to discover upon submitting the headset for
24   repair under the manufacturer's warranty that they in fact purchased Defendant's
25   refurbished headsets. [*Id.* ¶ 26.] Further, when surveying QSR establishments to
26   determine which headset system they use, over 100 employees have responded that
27   they use Defendant's system, when they actually use an HME system. [*Id.* ¶ 34.]
28   During oral argument, defense counsel argued that there is no likelihood of

1 confusion regarding Defendant's re-labeling of HME products because this re-
2 labeling occurs *after* the consumer already purchased the product.  Likelihood of
3 confusion, however, is not limited to confusion among purchasers.  Instead, the
4 Ninth Circuit has recognized a likelihood of confusion among non-purchasers or
5 post-purchase confusion.  *See Au-Tomotive Gold*, 603 F.3d at 1138 ("[W]e made
6 clear that the defendants did not deceive the direct purchasers of the products.
7 Rather, in both cases, we found trademark infringement based on a likelihood of
8 confusion on the part of non-purchasers."); *Karl Storz Endoscopy–America, Inc. v.*
9 *Surgical Tech., Inc.*, 285 F.3d 848, 854 (9th Cir. 2002) ("The law in the Ninth
10 Circuit is clear that 'post-purchase confusion,' i.e., confusion on the part of
11 someone other than the purchaser who, for example, simply sees the item after it has
12 been purchased, can establish the required likelihood of confusion under the
13 Lanham Act.").  Additionally, defense counsel admitted that when Defendant
14 refurbishes an HME product, the headset model remains the same, only enhanced by
15 Defendant's stronger casings.  This concession supports the Court's conclusion that
16 Defendant's re-labeling of Plaintiff's HME products is likely to confuse consumers.
17 *See also Rolex Watch, U.S.A., Inc. v. Michel Co.*, 179 F.3d 704 (1999) (quoting
18 *Champion Spark Plug Co. v. Sanders*, 331 U.S. 125 (1947)) (distinguishing cases
19 "where the reconditioning or repair would be so extensive or so basic that it would
20 be a misnomer to call the article by its original name, even though the words 'used'
21 or 'repaired' were added" from cases in which the "repair or reconditioning of the
22 [products] does not give them a new design.  It is no more than a restoration, so far
23 as possible, of their original condition.").  The Court finds that Plaintiff has
24 established a likelihood of confusion as to Defendant's re-labeling Plaintiff's HME
25 products.  Accordingly, Plaintiff has shown a likelihood of success on the merits as
26 to this claim.
27      Plaintiff has shown serious questions as to the merits of all three claims under
28 the Lanham Act.  Therefore, Plaintiff satisfies the first element for injunctive relief.

### B.     *Irreparable harm in the Absence of a Preliminary Injunction*

"Under *Winter,* plaintiffs must establish that irreparable harm is *likely*, not just possible, in order to obtain a preliminary injunction." *Cottrell*, 632 F.3d at 1131 (citing *Winter*, 555 U.S. at 21) (emphasis in original). The Court declines to apply a presumption of irreparable harm. *See Flexible Lifeline Sys., Inc. v. Precision Lift, Inc.*, 654 F.3d 989, 998 (9th Cir. 2011) (holding that "presuming irreparable harm in a copyright infringement case is inconsistent with, and disapproved by, the Supreme Court's opinions in *eBay* and *Winter*. . . . Accordingly, we hold that even in a copyright infringement case, the plaintiff must demonstrate a likelihood of irreparable harm as a prerequisite for injunctive relief, whether preliminary or permanent").

Defendant adamantly denies the likelihood of irreparable injury. [Doc. No. 40 at 6.] Defendant contends that Plaintiff's delay in seeking injunctive relief undermines any urgency or claim of irreparable injury. The Court is not persuaded. Contrary to Defendant's argument, Plaintiff did not wait two years to address the alleged trademark infringement. Instead, both parties acknowledge that Plaintiff attempted to address Defendant's conduct prior to filing the complaint. [*See* Noorian Decl. ¶ 9; Bjurstrom Decl. Exh. A.]  While Plaintiff did not file for injunctive relief until eight months after filing the complaint, Defendant does not allege any harm from the delay. Further, the parties have engaged in various attempts to settle the case, including the early neutral evaluation and case management conference. Although the Court considers Plaintiff's eight-month delay, it does not find the delay undermines any irreparable injury. *See Perfect 10, Inc. v. Cybernet Ventures, Inc.*, 213 F. Supp. 2d 1146, 1190 (C.D. Cal. 2002) (finding a nine-month delay did not bar injunctive relief).

Defendant also claims that the alleged infringement relates only to past conduct, and therefore there is no threat of future irreparable harm. To support this assertion, Defendant contends that it already modified its website and changed the color of its replacement parts. [Doc. No. 40 at 12; *see* Noorian Decl. ¶ 9.]  The asserted modifications, however, address only part of Defendant's alleged infringement.

1  Further, while "cessation of the unlawful conduct can moot such a dispute," to do so
2  "the reform of the defendant must be irrefutably demonstrated and total." *Polo*
3  *Fashions, Inc. v. Dick Bruhn, Inc.*, 793 F.2d 1132, 1135 (9th Cir. 1986); *see also Allee*
4  *v. Medrano*, 416 U.S. 802, 810-11 (1974) ("It is settled that an action for an injunction
5  does not become moot merely because the conduct complained of has terminated, if
6  there is a possibility of recurrence, since otherwise the defendants would be free to
7  return to (their) old ways.") (internal citations and quotation omitted). Plaintiff has
8  offered evidence demonstrating that although Defendant may have reformed its
9  conduct in the past, there is a possibility of recurrence. [*See* Bjurstrom Decl. Exh A at
10  2.] The Court finds Defendant does not irrefutably demonstrate that it has remedied
11  *all* the alleged infringement as to render the injunction moot.

12  Even when considering Plaintiff's delay in filing, the Court finds that Plaintiff
13  has demonstrated it will likely suffer irreparable harm. Plaintiff has submitted the
14  declaration of Mr. Haas describing various instances in which upset customers call
15  Plaintiff regarding their repairs—specifically why the manufacturer's warranty does
16  not cover their repairs or the progress and location of their repairs that the customers
17  actually sent to Defendant. [Haas Decl. ¶ 33.] This forces Plaintiff either to absorb the
18  costs for repairs as a goodwill gesture to preserve customer relations or to alienate
19  customers. [*Id.* ¶ 30.] Plaintiff also has offered evidence showing that when surveyed,
20  over 100 QSR employees have responded that they use Defendant's system, when in
21  fact they use Plaintiff's system. [*Id.* ¶ 34.]

22  The Court finds Plaintiff has demonstrated that Defendant's alleged
23  infringement, and the customer confusion that accompanies it, are likely to damage
24  Plaintiff's reputation and goodwill among its customers. *See Rent-A-Ctr., Inc. v.*
25  *Canyon Television & Appliance Rental, Inc.*, 944 F.2d 597, 603 (9th Cir. 1991)
26  (recognizing "that intangible injuries, such as damage to ongoing recruitment efforts
27  and goodwill, qualify as irreparable harm"); *CytoSport, Inc.*, 617 F. Supp. 2d at 1080
28  ("A trademark owner's loss of the ability to control its marks, thus, creates the potential

for damage to its reputation. Potential damage to reputation constitutes irreparable injury for the purpose of granting a preliminary injunction in a trademark case.") (internal citations omitted). Accordingly, the Court finds that Plaintiff has demonstrated it will likely suffer irreparable harm absent injunctive relief.[2]

### C. Balance of Equities favors Plaintiff

Defendant contends that it will suffer harm since it has already addressed the alleged infringement and that an injunction requiring written disclosure would impose significant costs on its business. As explained above, however, Defendant has not shown that it has already *completely* addressed the alleged infringement. Further, Defendant may provide written disclosure in various ways to minimize its expenses by incorporating a written, conspicuous disclosure into documents accompanying its business transactions, such as invoices or intake paperwork for repairs.

Importantly, an injunction enjoining Defendant's infringing conduct would not preclude Defendant from engaging in its normal business activities, including performing repairs and refurbishments of HME products and other headset equipment. *See CytoSport*, 617 F. Supp. 2d at 1081. Instead, the injunction only requires that Defendant refrain from using a mark similar to Plaintiff's trademark, re-selling Plaintiff's products without a written disclosure, and re-labeling Plaintiff's products when making only minor repairs. Without an injunction, however, Defendant's conduct will likely continue to confuse consumers, and Plaintiff will continue to suffer irreparable harm. Accordingly, the Court finds the balance of equities favors Plaintiff.

### D. Public Interest

Defendant argues that the public benefits from having access to Defendant's business and that an injunction would harm competition and Defendant's customers, who rely on services of repair and refurbishment for drive-thru headsets. Although competition that results from greater availability of products serves the public interest,

---

[2] The Court also notes that under the Ninth Circuit's sliding scale approach, even if Plaintiff has made a lesser showing of irreparable harm, that lesser showing is offset by Plaintiff's strong showing of success on the merits. *See Cottrell*, 632 F.3d at 1131.

the public's interest in competition does not trump its interest in avoiding consumer confusion. *See Au-Tomotive Gold*, 603 F.3d at 1139 ("Finally, [the defendant] argues that the public interest is served by the competition that results from the availability of products. It may be true that [the defendant's] activities serve to reduce the price paid by consumers. . . . But trademark law protects trademark holders from the competition that results from trademark infringement, irrespective of its effect on prices."). The Court finds a preliminary injunction serves the public's interest in preventing consumer confusion. *See Internet Specialties W., Inc. v. Milon-DiGiorgio Enterprises, Inc.*, 559 F.3d 985, 993-94 (9th Cir. 2009).

The Court finds that Plaintiff has shown a strong likelihood of success on the merits as to its section 32(b) claim and its section 43(a) claims under the Lanham Act; that Plaintiff has demonstrated it is likely to suffer irreparably injury to its reputation and goodwill absent injunctive relief; that the balance of equities tips sharply in Plaintiff's favor; and that injunctive relief is in the public's interest.

The Court therefore issues a **PRELIMINARY INJUNCTION** pending trial with the following terms:

1. Defendant shall not use Plaintiff's "HME" trademark or any similar mark likely to confuse or mislead consumers.

2. Defendant shall not represent that it is affiliated with or endorsed by Plaintiff in any way, including an authorized HME distributor, certified HME repair facility, or an "HME Nationwide Repair Facility."

3. Defendant shall label all HME products sold by Defendant as re-sold, used, and/or refurbished as the case may be. Defendant shall also provide a written disclosure accompanying each HME product that the HME products sold by Defendant are not covered by the HME manufacturer's warranty.

4. Defendant shall not pass off or palm off HME drive-thru products as Defendant's products. Accordingly, when Defendant's service or repair

of an HME product does not alter external parts, including but not limited to headset casings, overlay, or buttons, Defendant shall not re-label the HME product with Defendant's logo. Instead, Defendant shall return the product to the customer with the HME name, HME model name and number, HME serial number and HME FCC Identification number displayed on the product in substantially the same location and in substantially the same manner as before the repair.

5. However, when, in the course of servicing or repairing an HME product, Defendant determines that a headset casing, overlay, buttons or other external parts require replacement and Defendant elects to use its own replacement part, Defendant shall remove from the product anything that identifies the product with HME, including the HME name, HME model name and number, HME serial number and HME FCC Identification number. Defendant shall thereafter be responsible for the operation of the product and for compliance with all FCC regulations or requirements applicable to the product.

## **BOND**

Pursuant to Rule 65(c), when a court issues a preliminary injunction, it must also require that the movant post a bond "in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined." *See* Fed. R. Civ. P. 65(c). "The court has wide discretion in setting the amount of the bond, and the bond amount may be zero if there is no evidence the party will suffer damages from the injunction." *Masters Software, Inc. v. Discovery Commc'ns, Inc.*, 725 F. Supp. 2d 1294, 1308-09 (W.D. Wash. 2010) (quoting *Connecticut Gen. Life Ins. Co. v. New Images of Beverly Hills*, 321 F.3d 878, 882 (9th Cir. 2003)).

Defendant requests a bond amount of $500,000, alleging that it will incur substantial expenses from the injunction's written disclosure requirement. Defendant,

however, has not submitted any evidence to substantiate these expenses, or any other evidence regarding the financial ramifications of a preliminary injunction. Plaintiff, however, concedes a $50,000 bond is appropriate. The Court finds that this amount will be sufficient to cover the costs of written disclosure accompanying HME products and to pay other costs and damages sustained by Defendant if found to be wrongfully enjoined. Accordingly, the Court, in its discretion, orders that Plaintiff post a bond in the amount of $50,000.

### CONCLUSION

For the foregoing reasons, the Court **GRANTS** Plaintiff's motion for preliminary injunction. The Court issues a preliminary injunction pending trial with the above terms. Plaintiff shall post a bond in the amount of $50,000 within 5 business days of the date of this order.

**IT IS SO ORDERED.**

DATED: October 3, 2013

Hon. Michael M. Anello
United States District Judge