1
2
3
4
5          UNITED STATES DISTRICT COURT
6         SOUTHERN DISTRICT OF CALIFORNIA
7

| | |
|---|---|
| 8  HM ELECTRONICS, INC., a California corporation, | Case No.: 12cv2884-BAS-MDD |
| 9  Plaintiff, | ORDER RE MOTIONS RE SANCTIONS AND CONTEMPT |
| 10  v. | AGAINST DEFENDANTS AND THEIR ATTORNEYS FOR |
| 11  R.F. TECHNOLOGIES, INC., an Illinois corporation, BABAK | DISCOVERY MISCONDUCT; |
| 12  NOORIAN, and individual, | AND, |
| 13  Defendants. | |
| 14  | REPORT AND |
| 15  | RECOMMENDATION ON PLAINTIFF'S REQUEST FOR |
| 16  | ISSUE SANCTIONS AND AN ADVERSE INFERENCE |
| 17  | INSTRUCTION |
| 18  | |
| 19  | [ECF No. 295] |

20
21        On January 6, 2015, shortly after the close of discovery, Plaintiff
22   filed this joint motion alleging that Defendants intentionally withheld
23   and destroyed highly relevant electronically stored documents ("ESI").
24   (ECF Nos. 268, 288 (later refiled with redactions at ECF No. 295)).  On
25   April 17, 2015, the parties filed a joint supplemental statement

1

pursuant to this Court's Order.  (ECF Nos. 303, 304).  On May 8, 2015, Defendants filed an unsolicited supplemental declaration.  (ECF No. 309).

On July 24, 2015, this Court issued an Order setting a hearing on the joint motion and on the Court's own motion for sanctions under Rule 26(g) against Defendants and their attorneys for improper certifications of discovery responses.  (ECF No. 414).  On August 5, 2015, this Court held a hearing on the motions.  (ECF No. 419).

Defendants and certain of their attorneys engaged in sanctionable discovery practices in five ways:

1. Defendant Noorian, as CEO of Defendant R.F. Technologies, Inc. ("RFT"), signed certifications of discovery responses specifically stating that certain documents did not exist—even though it did; and that Defendant had no knowledge whether certain events occurred—even though it knew that those events, meetings and emails had occurred.  In that same vein, Defendants' attorney Thomas O'Leary certified discovery responses as true, to his knowledge or belief, without conducting a reasonable inquiry.  This conduct justifies sanctions against Defendants RFT and Noorian and attorney Thomas O'Leary under Rule 26(g)(3).

2. Defendants' attorneys did not craft and implement a litigation hold, or otherwise communicate to Defendants the importance of preserving relevant documents.  Sanctions under Rule 37 are warranted against Defendant RFT, attorney Thomas O'Leary, and the law firm LeClairRyan LLP for this failure.

2

3.   Soon after learning of this lawsuit, Defendant Noorian sent an email to Defendant RFT's sales force instructing them to "destroy" documents because they were relevant to this lawsuit.  Although Defendants dispute whether any documents were actually deleted, the evidence strongly supports a finding that an unknown number of relevant documents were deleted as a result of Defendant Noorian's instruction and by the failure to implement a litigation hold.  Sanctions against Defendant RFT under Rule 37 are warranted for the deletion of ESI pursuant to the email commanding destruction.

4.   Defendants' attorneys allowed the attorneys and vendors handling the ESI production to use limiting search terms, such as the word "confidential," which was part of every email sent from Defendant RFT, to justify withholding as privileged and without further review, more than 150,000 pages of ESI that were not privileged nor identified in a privilege log.  Rule 37 sanctions against Defendant RFT, attorney O'Leary, and the law firm LeClairRyan LLP are warranted for this failure.

5.   Defendants' attorneys failed to produce over 375,000 pages of ESI until well after the close of discovery because they failed to perform quality control checks or to supervise their ESI vendor. Sanctions under Rule 37 are warranted against Defendant RFT, attorney O'Leary, and the law firm LeClairRyan LLP for this failure.

These events were revealed only as a result of Plaintiff's diligence, and despite Defendants' stonewalling.  But for Plaintiff's persistence,

12cv2884-BAS-MDD

Defendants would have gained a significant and unfair advantage at trial.

Even though Plaintiff's diligence forced Defendants eventually to produce the improperly withheld documents, relevant documents remain missing.  Plaintiff has been forced to litigate this case with incomplete facts and to expend significant resources hunting down ESI that should have been delivered to Plaintiff years ago.

Defendants and their attorneys do not dispute these events; they dispute whether their behavior is sanctionable.  Other than admitting at the hearing on these motions that "mistakes were made," they are unrepentant and deny responsibility.  As discussed below, the Court finds that sanctions are warranted by Defendants' and their attorneys' behavior.  The question is the form and severity of the sanction to be imposed, and against whom.

### Facts

**A. Nature of the Case**

Plaintiff makes drive-thru headset systems, including the ION IQ. Defendant RFT repairs drive-thru headset products manufactured by Plaintiff and by others (most notably, 3M and Panasonic).  Defendant Noorian is the CEO and founder of Defendant RFT.  Plaintiff's First Amended Complaint ("FAC") asserts claims for trademark infringement, false designation of origin, trade dress infringement, trade libel, unfair competition and interference with prospective economic advantage.  (ECF No. 156).

4

A key piece of Plaintiff's evidence is a document entitled "HM Electronics IQ Failures" (the "Structural Failures Report" or "Report") and other documents showing the distribution of this Report to Plaintiff's competitors, customers and prospects.   Plaintiff alleges Defendants created the Structural Failures Report and designed it to look like an HME internal quality control document.  The Report, purportedly authored by Plaintiff, acknowledged durability problems of its ION IQ product.  In fact, Defendants created the document, inserted pictures of an ION IQ headset they had disassembled, and fabricated the durability and lifetime repair cost information they distributed along with the Report.  Defendants distributed the fabricated Structural Failures Report and average repair rate information to clients, potential clients, and Plaintiff's competitors, including Panasonic, who in turn distributed it to over 9,600 recipients.

## B. Summary of Discovery Disputes

By the time this Court inherited this case, the docket—now spanning over 400 entries—was riddled with discovery disputes.  Many of those disputes relate directly to this motion.

The previously assigned magistrate judges have held nine discovery conferences, two settlement conferences, and two case management conferences.  (ECF Nos. 29, 32, 38, 50, 62, 64, 65, 71, 76, 77, 83, 84, 98).  Attorneys Thomas O'Leary and Mark Goldenberg appeared on behalf of Defendant RFT at most of these conferences.  (*Id.*).  Many of the conferences focused primarily on "the status of defendant's production of documents."  (*See e.g.*, ECF Nos. 60, 62, 64,

5

65).  Magistrate Judge McCurine, originally assigned to the case, focused the parties' attention on "any remaining e-discovery issues" as early as August 22, 2013.  (ECF Nos. 38, 36).  Following one of the discovery conferences, Magistrate Judge McCurine issued an Order that required Defendant RFT[1] to complete its document production by February 10, 2014, and required its attorneys to complete the privilege log by February 17, 2014.  (ECF No. 71).  The magistrate judges assigned to this case have also entertained nine motions seeking contempt or sanctions, several motions seeking miscellaneous discovery-related relief, and have continued discovery and pre-trial deadlines four times because of document production issues.  (ECF Nos. 70, 72, 88, 90, 101, 105, 106, 138, 185-187, 203, 204, 209, 219, 224, 251, 268, 295).

In a July 3, 2014, discovery Order, Magistrate Judge Burkhardt found Defendant RFT had violated the non-ESI portions of Magistrate Judge McCurine's January 27, 2014, Order requiring it to complete its document production by February 10, 2014.  (ECF No. 185).  Magistrate Judge Burkhardt declined to find that Defendant RFT had violated the January 27, 2014, Order as to its ESI production because the Order was not specific enough about the search term agreement for the ESI production.  (*Id*.).  Magistrate Judge Burkhardt ordered Defendant RFT to complete its production—including ESI—by August 4, 2014, and

---

[1] At the time, Defendant RFT was the only named defendant.  Roughly one and a half years later, on May 27, 2014, Mr. Noorian was added as a defendant.  (ECF No. 156).

ordered Defendant to submit a sworn declaration to Plaintiff certifying that requested documents had been produced, identifying the documents responsive to each request by Bates number, and "mak[ing] a detailed showing as to whether adequate searches were conducted in response to the January 27, 2014, Order, including an explanation of the search terms, custodians, computer drives, or other locations searched." (ECF No. 185 at 10).  Magistrate Judge Burkhardt also awarded Plaintiff $15,224.62 (half of its requested costs and fees in bringing the motion) as Rule 37 sanctions against Defendant RFT. (*Id.*).

## C. Detailed Facts re Discovery Misconduct

### 1. The "Destroy" Email

#### i.    Service of Complaint on Defendants

On December 5, 2012, Plaintiff served Defendant RFT with the summons and complaint in this matter.  (ECF No. 5).  Defendant Noorian was Defendant RFT's top executive and its agent for service of process.  (*Id.*).  Defendant Noorian knew of the lawsuit that day, and understood then that Plaintiff was complaining about RFT's use of the bogus Structural Failures Report.  (ECF No. 288-22 (Exh. 42) at 19:10-17).

#### ii.    December 6, 2012 email to Noorian

That very evening, at 4:50 p.m., Defendant Noorian sent an email to Mark Sullivan, then Director of Sales at RFT, with a courtesy copy to Tony DeLise, President and COO.  (ECF No. 268-21 (Exh. 14) at 2). Defendant Noorian wrote: "Mark, HME is claiming that we are,

7

specifically you [sic] certain material that is false and hurtful to their business.  Please provide me with ALL the examples of your sales material that relates to HME before end of day tomorrow."  (*Id.*).

The next day, Mr. Sullivan responded and attached "a complete zip of materials that pertain to this," and listed the contents of that zip drive as follows:

> Benefits of Attune
>
> Attune durability and ION mechanical failures
>
> Dunkin Brands attune web flyer
>
> Numerous emails pushing Attune with attachments of above
>
> Example of typical customer dialog about HME breaking down
>
> Typical email of RFT superior repairs and cost savings
>
> Some Clip lines of copy that are used in various proposals to customers

(*Id.* at 2-3).  The bogus Structural Failures Report was included, as were internal emails about RFT's creation of the Report, pictures RFT had taken of Plaintiff's product that were used in the Report, statements about the durability and cost of Plaintiff's product, and emails distributing the Report.  The zip drive included five screenshots showing 100+ electronic documents that Mr. Sullivan found on his computer using the search term "attune."  (ECF No. 307-7 (Exh. 54)).  Mr. Sullivan used both his marks@rftechno.com and his business.management@rftechno.com addresses in emails included in

the zip drive that Defendant Noorian received.  (ECF No. 268-21 (Exh. 14) at 4 and 11; *see also*, ECF No. 307-7 (Exh. 54) at 11 (screenshot in zip file showing "Emails Pushing Attune Since July 2011" showing "From: business management" regarding the highlighted email).  Defendant Noorian looked at the contents of the zip file when he received it from Mr. Sullivan.  (ECF No. 288-2 (Exh. 42) at 21:13-17).

On December 6, 2012, Defendant Noorian instructed Helen Fansler, his executive assistant, to create a file with Mr. Sullivan's email and zip file "so we can access it when the time comes."  (ECF No. 288-17 (Exh. 35)).  Ms. Fansler created both a hard copy and an electronic version of the folder.  (ECF No. 288-2 (Exh. 42) at 22:3-16).

### iii.   Email to employees to "destroy" documents

On December 19, 2012, Defendant Noorian sent Mark Sullivan (former RFT Director of Sales), Philip Tondelli (RFT VP of Sales), and Tony DeLise (RFT President) an email instructing them to destroy all "electronic and printed copies any of you may have" of the "HME failure pictures" in the Structural Failures Report.  (ECF No. 288-13 (Exh. 31)).  Defendant Noorian sent another email approving Mark Sullivan's offer to forward the "destroy" instruction to other employees, which he did.  (ECF No. 288-14 (Exh. 32); ECF No. 288-15 (Exh. 33)).  Defendant Noorian never retracted nor clarified his instructions.  (ECF No. 288-22 (Exhibit 42) at 13-14, 41-42).

Plaintiff has identified, through third party subpoenaed documents, Report-related documents that Defendants failed to produce on their own.  (ECF No. 305-1 (Herrera Decl.) ¶ 14).  Specifically,

Plaintiff points to the Mark Sullivan December 6, 2012, email and zip file containing relevant documents.  At his deposition on April 1, 2014, Mark Sullivan produced the email and attached zip file.  (ECF Nos. 268-21-24 (Exh. 14), 268-25 (Exh. 15)).  Attorneys Thomas O'Leary and Mark Goldenberg appeared on behalf of Defendant RFT at Mr. Sullivan's deposition.  (ECF No. 268-25 (Exh. 15) at 4).  Defendant did not produce any version of the email until one year later, in April of 2015.  (*Id.* ¶¶ 14-15; ECF No. 305-2 (Exh. 55)).  The version Defendant produced is missing some of the documents in the zip file that were produced by Mr. Sullivan.  (*Id.*).  Defendants also have not been able to confirm production of all of the 100+ documents shown in the five screen shots.  (*Id.*; ECF No. 309 (Vanderhoof Supp. Decl.)).

**2.  False Verifications and Declarations**

Plaintiff first requested the documents at the center of this dispute from Defendant RFT on August 26, 2013, soon after discovery opened.  (ECF No. 125-11 at 2).  Defendant agreed to begin its rolling document production by October 18, 2013, but did not begin producing documents until November 25, 2013. (ECF Nos. 101-4 at 2; 101-6 at 2; 185 at 1-2 (Magistrate Judge Burkhardt's July 3, 2014, Order); 268-2 ¶ 4).

**i.  Written responses to document demands**

Defendant RFT served its written responses to the request for production of documents on October 18, 2013.  (ECF Nos. 268-17 (Exh. 11) at 11).  Defendant RFT's lead counsel Thomas O'Leary signed these written responses on October 16, 2013.  (*Id.* at 10).

10

1    In response to Request No. 23, seeking documents concerning "the
2    creation, receipt, use, publication and/or distribution of the
3    DOCUMENT entitled 'HM Electronics IQ Structural Failures,'"
4    Defendant asserted objections and then falsely stated that it "may have
5    responsive documents, but is uncertain at this time." (ECF No. 268-15
6    (Exh. 11) at 15).  Defendant provided the same false response to
7    Request No. 25, seeking documents reflecting communications about
8    the Structural Failures Report.  (*Id*. at 16).  Defendant also falsely
9    responded that it "may have responsive documents, but is uncertain at
10   this time," in response to Request No. 41 seeking pictures taken of
11   Plaintiff's product for any purpose.  (ECF No. 268-16 (Exh. 11) at 8).

12       RFT refused to provide documents in response to Request No. 26,
13   which sought documents between RFT and Panasonic about the
14   Structural Failures Report, on the grounds that such documents are
15   irrelevant.  (ECF No. 268-15 (Exh. 11) at 16-17).

16       In response to Request No. 28, RFT refused to produce documents
17   concerning its "opinions, statements, AND/OR declarations regarding
18   the repair frequency of any HME Drive-Thru Headset Product," because
19   "it could be thousands of documents every year." (ECF No. 268-16 (Exh.
20   11) at 1).  Defendant refused to produce documents responsive to
21   Request No. 33, calling for communications with third parties about
22   Plaintiff's products, also on the basis that "it could be thousands of
23   documents every year." (*Id*. at 3-4).  Defendant offered the same
24   response to Request No. 34, which called for communications with third

12cv2884-BAS-MDD

parties about Defendant's advertisements concerning Plaintiff or its products.  (*Id*. at 4).

After Plaintiff challenged the sufficiency of these responses, Defendant RFT provided supplemental responses.  (ECF No. 268-18, 268-19 (Exh. 12)).  Defendant RFT's lead counsel Thomas O'Leary signed the supplemental responses on December 12, 2013, and Defendant Noorian, in his capacity as President of RFT, verified the supplemental responses under penalty of perjury on December 5, 2013. (ECF No. 268-19 (Exh. 12) at 6-7).

In response to Request No. 26, concerning documents between RFT and Panasonic about the Structural Failures Report, Defendant falsely supplemented: "Responding Party has produced documents responsive to this Request."  (*Id*. at 3).

In response to Request No. 28 seeking documents concerning RFT's "opinions, statements, and/or declarations regarding the repair frequency of any HME drive-thru product, for the period January 1, 2005 to the present," Defendant's supplemental response stated "Responding Party has no documents responsive to this request."  (ECF No. 268-19 (Exh. 12) at 4-5).

## ii.   Responses to first set of interrogatories

Defendant RFT served interrogatory responses on October 18, 2013.  (ECF No. 268-11 (Exh. 8) at 11).  RFT's lead counsel Thomas O'Leary signed the interrogatory responses on October 16, 2013.  (*Id*. at 9).  Defendant Noorian signed the interrogatory responses under penalty of perjury on October 18, 2013.  (*Id*. at 10).

In response to Interrogatory No. 13, "identify all persons to whom you provided the 'HM Electronics IQ Structural Failures' document or any of the contents set forth therein," Defendant RFT objected and stated that Mark Sullivan, who was no longer employed with RFT, could identify such persons. (*Id*. at 6).

Defendant provided only objections in response to Interrogatory No. 20, "identify all person(s) with Panasonic who may have knowledge regarding the content and distribution of the 'HM Electronics IQ Structural Failures' document." (*Id*. at 8-9).

When Plaintiff challenged the sufficiency of these responses, Defendant supplemented them. (ECF No. 268-12 (Exh. 9)). The responses were signed by James C. Hildebrand for Thomas O'Leary, and were verified under penalty of perjury by Defendant Noorian. (*Id*. at 9).

Defendant revised Interrogatory No. 13 to falsely state that "Mark Sullivan is the only person with knowledge to whom, if anyone, the 'HM Electronics IQ Structural Failures' document was distributed." (*Id*. at 6). Defendant also revised its response to Interrogatory No. 20, responding that RFT "is unaware of any person at Panasonic who may have knowledge regarding the content and distribution of the 'HM Electronics IQ Structural Failures' document." (*Id*. at 8).

### iii.   **Defendant RFT's initial document collection**

Defendant RFT made its first document production in hard copy format on November 25, 2013. (ECF Nos. 101-6 at 2; 185 at 2; 268-2 ¶ 4). Internal emails show that RFT was gathering ESI for review on

November 1, 4, and 5, 2013.  (ECF No. 288-18 (Exh. 38); ECF No. 307-3 (Exh. 50); ECF No. 307-4 (Exh. 51); ECF No. 307-5 (Exh. 52); ECF No. 307-6 (Exh. 53)).  Defendant Noorian testified he was not involved in collecting documents for production and that Helen Fansler, Executive Administrator, and Steve Combs, IT Director, "were the key people in gathering the documents."  (ECF No. 288-22 (Exh. 42) at 23:8-12).

One email from Helen Fansler to Defendant Noorian entitled "Number 17 of Production," asks whether Defendant Noorian wants "any more changes made to it," and that Scott "already took out part numbers and one of the pictures."  (ECF No. 307-3 (Exh. 50) at 2).  She finished, "[g]oes with No. 17…Your inspection, testing, repair and maintenance guidelines, procedures and/or instructions (including drafts), for HME's Drive-Thru Headset Products…"  (*Id.*; *see also*, ECF No. 307-5 (Exh. 52)).

In two other emails dated November 4, 2013, with subject lines referring to "IQ Failures" from Helen Fansler to Defendant Noorian, she asks Defendant Noorian for his approval to forward attached emails to attorney Mark Goldenberg.  (ECF No. 288-18 (Exh. 38) at 11; ECF No. 307-1 (Exh. 47B)).  The emails she sought permission to forward to the attorney were Mark Sullivan sales emails to customers attaching the Structural Failures Report and related information.  (*Id.*).

Another email from Scott Crause, VP of Operations, to Scott Richardson asks for repair procedures for the HME 6000 AIO and the HME 2000 "for the thing I'm working on."  (ECF No. 307-4 (Exh. 51)).  Scott Richardson found one, which he attached as "Hs6000

procedure.doc," but could not find the other, acknowledging "I know we had one but it is not in the folder anymore," so he offered to "type one up quickly." (*Id*.). A few days later, Ms. Fansler sent Scott Crause an email with an attachment titled "HS6000 laywer (2).doc," explaining formatting changes she had made. (ECF No. 307-5 (Exh. 52)). A little while later, Scott Crause sent Ms. Fansler an email asking her to "rework this like you did the other one and send back to me." (ECF No. 307-6 (Exh. 53)).

Although Defendant RFT gathered all these emails and their attachments in November 2013, it did not produce any of them for over a year. Defendant produced one of them on November 17, 2014, and did not produce the rest of them until January 8, 2015.

<u>iv.</u>      <u>**Responses to second set of interrogatories**</u>

On July 9, 2014, Defendants served responses to Plaintiff's second set of interrogatories. (ECF No. 288-8 (Exh. 22)). The objections were signed by Thomas O'Leary. (*Id*.). Defendant Noorian verified the responses under penalty of perjury. (*Id*.). Interrogatory No. 23 called for Defendants to identify the participants, date, and location of any meetings from January 1, 2012, to the present between RFT and Panasonic where HME was discussed. (*Id*. at 9). Defendants provided no substantive response, but included a page of objections, including objections to terms like "present," "meetings," "discussed," "mentioned," "Panasonic Systems Communications Company of North America," and "referred to" on the grounds that they were "undefined, vague, ambiguous and lack foundation." (*Id*.).

1    Defendant supplemented this response in August of 2014 with

2   this false statement:

> RFT does not possess any information within its
> possession, custody, or control that is responsive to
> Plaintiff's request identifying the persons present, as
> well as the date and location of all meetings between
> Defendant Panasonic, wherein Plaintiff was discussed,
> mentioned, or referred to from January 1, 2012 to the
> present date.  However, the Defendant can identify that
> Mark Sullivan and Lillia Taschuk—who are no longer
> employed by the Defendant—may possess information,
> if such may exist, responsive to this request because
> they would have been the individuals involved in any
> such meetings, had they taken place.

12   (ECF No. 269-2 (Exh. 23) at 10-11).  This supplemental response was

13   signed by Thomas O'Leary on August 21, 2014, and verified by

14   Defendant Noorian on August 22, 2014.  (*Id.* at 11-12).

## v.    Document production assurances

16    In advance of a December 12, 2013, conference with Magistrate

17   Judge McCurine, the parties submitted a joint letter to the court, signed

18   by Brian Vanderhoof of LeClairRyan LLP, in which Defendant RFT

19   stated that it had produced 1004 pages of documents, and insisted that

20   "[a]ll other responsive documents have been made available for review

21   and inspection as they are maintained in the usual course of business"

22   in the form of 200 boxes of hard copy documents in warehouses in

23   Illinois.[2]  (ECF No. 125-11).

---

[2] The boxes in Illinois warehouses did not contain the ESI documents at issue in this motion.

16

1    As of January 9, 2014, Defendant had produced a "grand total" of
2    1,183 documents.  (ECF No. 125:13:19-20).  Mr. O'Leary wrote
3    Plaintiff's counsel that "[a]ll documents responsive have been
4    produced.....  R.F. Technologies diligently searched for responsive
5    documents...."  (ECF No. 268-20 (Exh. 13) at 2).  Mr. O'Leary further
6    stated "[n]o responsive documents were withheld on account of
7    privilege."  (*Id*. at 3).
8        On January 22, 2014, Defendant represented in a joint letter to
9    Magistrate Judge McCurine that it would search further for specified
10   categories of documents, including emails regarding the Report or the
11   average repair rate and cost information, as well as communications
12   between RFT and any third party about Plaintiff or its products.  (*See*
13   ECF No. 185 (Magistrate Judge Burkhardt's Order describing contents
14   of January 22, 2014 letter)).
15       During a February 28, 2014, court-ordered meet and confer
16   discussion, the following exchanges took place between counsel:
17          MS. HERRERA:    The next topic concerns RFT
18          product durability claims and particularly it's
             representations made in their structural failures report
19          and communications regarding the same.  And the point
             we made previously was that your client produced very
20          little documents on this point and you agree to
             undertake an ESI search for further responsive
21          documents.  And we've seen nothing further.
22
23          MR. O'LEARY:  All right.  All e-mails responsive to that
24          have been produced.
25

                                     17

1   MS. HERRERA:  Are you representing that your client
2   did undertake—

3   MR. O'LEARY:  I'm not representing anything.  I'm
4   saying that all e-mails have been produced.

5   MS. HERRERA:  Well, I'm looking at our joint letter to
6   Judge [McCurine] on January 22nd, that you agreed that
    your client will undertake a further ESI search for
7   responsive documents on RFT server, including, but not
    limited to, e-mails received by former employee, Mark
8   Sullivan.  So my question is did your client do that?
9
10  MR. O'LEARY:  Yes.  And the e-mails regarding [the] IQ
    structural failures report have been produced.  And I
11  think we have said in previously meet and confers,
12  Mark Sullivan's work computer had very little on it.

13  MS. HERRERA:  Is that the only place you searched is
14  his work computer?

15  MR. O'LEARY:  That's not what I said.  The e-mails
16  with regard to the IQ structural failure report have been
    produced.
17
18  MS. HERRERA:  Just so I'm clear, you produced some
    early on in the Bates label 172 to 262 range.
19
20  MR. O'LEARY:  Yes.

21  MS. HERRERA:  Have you produced anything beyond
22  that?

23  MR. O'LEARY: No.  All the e-mails with regard to RFT
24  structural report were produced in the responsive
    documents.
25

18

MS. HERRERA:  And a search was undertaken beyond Mark Sullivan's information?

MR. O'LEARY:  Yes.

(ECF No. 268-27 (Exh. 17) at 14-15).

MS. HERRERA: We're just really surprised that virtually–hardly any third-party communications have been produced.

MR. O'LEARY: Everything's been produced.

MS. HERRERA: Did your client conduct an ESI search for communication[s]?

MR. O'LEARY: Everything has been produced.

MS. HERRERA: Well, that's not really my question.

MR. O'LEARY: That's my response, though. We produced everything when we did that by checking computers.

MS. HERRERA: I'd like to understand the methodology you did conduct.

MR. O'LEARY: I didn't conduct the ESI search, so I don't know the methodology. They were told to look for documents on their computer.  They did so and we produced them. *** [T]hey obviously conducted the search and produced what they had.

(*Id*. at 23:1-21).

Defendant had not reviewed or produced its ESI as of the date Mr. O'Leary made these statements.  It was not until March of 2014 that

19

Setec, one of Defendant's ESI vendors, "was tasked by Thomas O'Leary from LeClairRyan… to perform keyword searches against [data totaling over 300 GB] to isolate and extract potentially relevant communications."  (ECF No. 269-28 (Decl. of Todd Stefan, ESI vendor Setec's Vice President) ¶ 4).  Defendant's vendor Setec provided the processed data to vendor iDiscover in two batches on April 25 and 28, 2014, and iDiscover later provided the processed data to Defendants' attorneys.  (*Id*. at ¶ 5).

### 3. <u>Lack of Litigation Hold</u>

During a December 2014 deposition limited to the purpose of exploring and curing the alleged spoliation, Defendant Noorian could not remember whether any attorney ever told him to preserve information in connection with the lawsuit or told him not to destroy or delete anything.  (ECF No. 288-22 (Exhibit 42) at 13:7-20, 41-42).  He had never heard the term "Litigation Hold Notice" before.  (*Id*. at 13:17-20).  When asked if "RFT ever had cause to send out something similar to [] a Litigation Hold Notice telling employees to make sure not to destroy and to preserve certain documents," Defendant Noorian said "no."  (*Id*. at 14:4-10).

Before this Court, at the hearing on these motions, the LeClairRyan attorneys conceded that they had not done anything specific to preserve ESI, because they were satisfied with Defendant Noorian's assertion that RFT does not delete documents in the normal course of business.

12cv2884-BAS-MDD

RFT does not have a written policy requiring employees to preserve and not delete data.  (*Id.* at 41:10-18, 42:7-11).  And, "nothing was sent out" to employees in this case to tell them to preserve documents.  (*Id.* at 42:12-20).  Defendant Noorian testified that "[a]s far as I know, nobody destroys anything within our company," but conceded that deletion was possible, because not all employee work is performed on computers backed up by the server, and "I've got 60 employees.  I can't possibly check everybody's behavior."  (*Id.* at 7:1-16, 9:11-20, 12-13, 36:24-37:4, *see also*, 29:1-11; ECF No. 288-25 (Exh. A) at 11:5-12:4).

Defendant Noorian also testified that, to his knowledge, no efforts had been made to see if anyone had deleted documents, or to recover any documents that had been deleted.  (*Id.* at 30:12-31:1).  Defendants have not provided declarations from any RFT employees stating that they did not destroy, delete or alter any documents.  At the hearing, Defendants' attorneys argued that they recently hired a computer forensic expert to analyze Mark Sullivan's laptop, but they conceded that the computer forensic expert has not analyzed other RFT employees' computers to determine if documents were deleted.

### 4. ESI Withheld As Privileged Without Review Based Solely On Limiting Search Terms

Defendant RFT's attorneys withheld more than 150,000 non-privileged documents as privileged even though no privilege review was conducted, simply because they contained search terms like "confidential."  (ECF No. 268-2 ¶ 8 (declaration of Brian Vanderhoof of LeClairRyan LLP describing search term error)).  Defendants' lead

21

counsel temporarily delegated ESI discovery to another firm, which—unbeknownst to anyone except RFT's IT Director—used 59 exclusionary search terms to withhold documents as privileged.  (ECF No. 268-2).  Defendant RFT's email program automatically affixes a confidentiality footer to emails, so emails were withheld merely because they contained the term "confidential."  The other exclusionary search terms similarly resulted in other non-privileged documents being withheld.  No one reviewed the withheld documents, or even a sample of them, to determine if they actually were privileged, and they were not listed on a privilege log.  (ECF No. 269-4 (Exh. 25) at 3).

Even so, Defendants' lead counsel repeatedly confirmed that all responsive non-privileged documents had been produced.  On July 25, 2014, in response to Magistrate Judge Burkhardt's July 3, 2014 Order requiring completion of the document production, Thomas O'Leary sent Plaintiff's counsel a letter emphasizing that "during the pendency of the Court's decision on Plaintiff's motion for discovery sanctions, RFT did indeed produce all of the documents sought by Plaintiff."  (ECF No. 268-30 (Exh. 19) at 4).

On August 8, 2014, Thomas O'Leary filed a declaration signed under penalty of perjury in response to Magistrate Judge Burkhardt's July 3, 2014, discovery Order.  (ECF No. 192).  He declared, "during the three-month pendency of the Court's decision on Plaintiff's motion, RFT did indeed produce all of the documents sought by Plaintiff."  (*Id*. ¶ 3; *see also* ¶¶ 4 and 5 (essentially restating same)).  Mr. O'Leary attached and described his July 25, 2014, letter to Plaintiff's counsel.  (*Id*. ¶ 6).

Mr. O'Leary then went through the discovery requests at issue one-by-one and serially declared that RFT had produced all responsive documents. For instance, he declared,

> RFT was ordered to produce all emails and other communications regarding the "HM Electronics IQ Structural Failures" document it published. (Dkt. No. 185, p.12:21-22). However, RFT has already produced to Plaintiff's counsel its emails and other communications regarding the "HM Electronics IQ Structural Failures" document….

(*Id.* ¶ 22; *see also id.* ¶¶ 24, 26, 28, 30). Finally, Mr. O'Leary declared that "RFT has already produced the documents resulting from the [court-ordered] ESI searches to Plaintiff's counsel." (*Id.* ¶ 31). Mr. O'Leary concluded by accusing Plaintiff of conducting a "tiresome and incessant 'discovery war'." (*Id.* ¶ 33).

Also in response to Magistrate Judge Burkhardt's Order, Stephen Combs, RFT's Director of IT, signed a declaration on September 3, 2014. (ECF No. 268-5). Mr. Combs declared, in part, that he "provided a wealth of electronic data to RFT's electronic discovery vendor," including 4 Exchange Information Stores (including 146 individual email accounts) and 17 PST files that totaled over 300 GB. (*Id.* at ¶ 14).

Mr. Combs further declared "[i]t is my understanding that these email accounts were searched using key terms provided by Plaintiff. I am informed and believe that the search terms utilized by the vendor included the following: [listing 21 search terms]. I am further informed and believe that these search terms were later revised to include certain

12cv2884-BAS-MDD

1  Boolean search limiters." (*Id.*).  Mr. Combs did not explain what

2  limiters were implemented for whom and for what purpose, and the

3  statement did not catch the litigants' attention at the time.  Mr. Combs

4  further declared that he understood that under Magistrate Judge

5  Burkhardt's Order,

> RFT must conduct a broad-based ESI search using
> twenty-two agreed upon search terms, and it must
> produce documents resulting from such ESI searches.
> (Dkt. No. 185, p. 13:13-17).  As set forth at paragraph 14
> above, RFT has already produced the documents
> resulting from the foregoing ESI searches to Plaintiff's
> counsel.

12  (*Id.* at ¶ 26).

13      The search term/privilege review error was finally discovered

14  when Plaintiff used Mr. Combs' Declaration to show an inconsistency

15  between the amount of data Defendant RFT provided its vendor and the

16  amount of data produced, along with a comparison of documents

17  produced by third parties that had not been produced by Defendant.  As

18  a result, Defendant produced these documents on a rolling basis from

19  September to November 2014.

20  **5.  Post-Discovery Document Dump**

21      Defendant RFT also did not produce over 375,000 pages of

22  responsive documents until after the filing of this motion and the close

23  of discovery.  Defendant explains this occurred because the ESI vendor

24  inadvertently failed to export all of the data to be produced.  (ECF No.

25  269-28 (Stefan Decl.) ¶ 5).  One of the ESI vendor's employees, believing

the data export complete, disconnected the drive before all the data had been exported. Defendants and their vendor discovered the error in December 2014 while preparing their opposition to this motion. They produced the newly-discovered data on a rolling basis between January and April 2015. In May 2015, the Defendants' attorneys produced still more documents that had been improperly withheld. (ECF No. 309).

## Discussion

### A. Legal Standard

The Court's authority to sanction a party for spoliation of evidence arises from both its inherent power to impose sanctions in response to litigation misconduct and from Rule 37. *See* FED. R. CIV. P. 37(b)(2)(C); *Lewis v. Ryan*, 261 F.R.D. 513, 518 (S.D. Cal. 2009). Rule 37(b)(2)(A) states:

> If a party or a party's officer, director, or managing agent—or a witness designated under Rule 30(b)(6) or 31(a)(4)—fails to obey an order to provide or permit discovery, including an order under Rule 26(f), 35, or 37(a), the court where the action is pending may issue further just orders. They may include the following:
>
> (i)   directing that the matters embraced in the order or other designated facts be taken as established for purposes of the action, as the prevailing party claims;
>
> (ii)  prohibiting the disobedient party from supporting or opposing designated claims or defenses, or from introducing designated matters in evidence;
>
> (iii) striking pleadings in whole or in part;

25

(iv)   staying further proceedings until the order is obeyed;

(v)   dismissing the action or proceeding in whole or in part;

(vi)   rendering a default judgment against the disobedient party; or

(vii)   treating as contempt of court the failure to obey any order except an order to submit to a physical or mental examination.

Subsection (b)(2)(C) adds:

> Instead of or in addition to the orders above, the court must order the disobedient party, the attorney advising that party, or both to pay the reasonable expenses, including attorney's fees, caused by the failure, unless the failure was substantially justified or other circumstances make an award of expenses unjust.

The Court also has authority to sanction parties and counsel under Rule 26(g).  Rule 26(g) requires a signature by a party or its counsel on discovery responses and objections, and states:

> By signing, an attorney or party certifies that to the best of the person's knowledge, information, and belief formed after a reasonable inquiry:

> (A) with respect to a disclosure, it is complete and correct as to the time it is made; and

> (B) with respect to a discovery request, response, or objection, it is:

26

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

          i.   consistent with these rules and warranted
              by existing law….;

         ii.   not interposed for an improper purpose, such
              as to harass, cause unnecessary delay, or
              needlessly increase the cost of litigation; and

        iii.   neither unreasonable nor unduly
              burdensome or expensive….

FED. R. CIV. P. 26(g)(1).  The Court, "on motion or on its own, must impose an appropriate sanction on the signer, the party on whose behalf the signer was acting, or both," when a certification violates Rule 26(g)(1) without substantial justification.  FED. R. CIV. P. 26(g)(3).  Rule 26(g) is "cast in mandatory terms." *Chambers v. NASCO, Inc.*, 501 U.S. 32, 51 (1991); Advisory Committee Notes to 1980 Amendment to FED. R. CIV. P. 26(g) ("Because of the asserted reluctance to impose sanctions on attorneys who abuse the discovery rules,… , Rule 26(g) makes explicit the authority judges now have to impose appropriate sanctions and requires them to use it.").  The mandate extends to *whether* a court must impose sanctions, though not to *which* sanction to impose.  *Id.*

Federal courts do not require perfection in ESI discovery.  *The Pension Comm. Of the Univ. of Montreal Pension Plan v. Banc of Am. Securities, LLC*, 685 F.Supp.2d 456, 461 (S.D.N.Y.); *see also* Advisory Committee Notes to proposed new Rule 37(e) (noting that "perfection in preserving all relevant electronically stored information is often impossible," and "'[t]his rule recognizes that reasonable steps' to

preserve suffice; it does not call for perfection."). The touchstone of

discovery of ESI is reasonableness. (*Id.*). However, as one court noted,

> If litigants are to have any faith in the discovery
> process, they must know that parties cannot fail to
> produce highly relevant documents within their
> possession with impunity. Parties cannot be permitted
> to jeopardize the integrity of the discovery process by
> engaging in halfhearted and ineffective efforts to
> identify and produce relevant documents.

*Bratka v. Anheuser-Busch Co., Inc.*, 164 F.R.D. 448, 463 (S.D. Ohio

1995). "Litigation is not a game. It is the time-honored method of

seeking the truth, finding the truth, and doing justice." *Haeger v.

Goodyear Tire & Rubber Co.*, --F.3d--, 6 n.1 (9th Cir. July 20, 2015)

(quoting *Haeger v. Goodyear Tire and Rubber Co.*, 906 F.Supp.2d 938,

941 (D. Ariz. 2012)).

## B. Analysis

The Court notes that, on August 3, 2015, the parties filed a joint

notice that they are in the process of finalizing a settlement. (ECF No.

416). The Court's decision to impose sanctions under Rule 26(g)(3)

outlives the anticipated settlement and voluntary dismissal of the case.

*Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 395 (1990); *Haeger v.

Goodyear Tire & Rubber Co.*, --F.3d--, *18-19, No. 12-17718 (9th Cir.

July 20, 2015); *In re Exxon Valdez*, 102 F.3d 429, 431 (9th Cir. 1996);

*Greenberg v. Sala*, 822 F.2d 882, 885 (9th Cir. 1987); *Heinrichs v.

Marshall and Stevens, Inc.*, 921 F.2d 418, 420-421 (2d Cir. 1990);

*Fosselman v. Gibbs*, No. C 06-0375-PJH-PR, 2010 WL 1008264, *4 (N.

D. Cal. March 18, 2010), *aff'd*, 473 Fed. Appx. 639 (9th Cir. 2012).  Even if Plaintiff were to withdraw its motion for sanctions under Rule 37, which it did not do in the notice of settlement or at the hearing, (ECF Nos. 416, 419), the Court is required to impose sanctions for Rule 26(g) violations made without substantial justification.  FED. R. CIV. P. 26(g)(3); *Chambers, supra*, 501 U.S. at 51.

### 1. Rule 26(g)

The point of Rule 26(g) is to hold someone personally responsible for the completeness and accuracy of discovery responses.  Rule 26(g) requires a signature by a party or its counsel on discovery responses and objections, certifying "that to the best of the person's knowledge, information, and belief *formed after a reasonable inquiry*" the response or objection is "consistent with these rules and warranted by existing law" and "not interposed for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation. FED. R. CIV. P. 26(g)(1) (emphasis added).  Here, both Defendant Noorian and attorney Thomas O'Leary certified discovery responses on behalf of Defendant RFT that were false, misleading, and made without first conducting a reasonable inquiry.

Defendant Noorian knew, from his own personal involvement and from his review of the documents he requested from Mark Sullivan in December 2012, that responsive documents existed, but nevertheless signed discovery responses denying the existence of those documents. Defendant RFT, through its representative Noorian, also falsely signed discovery responses, thereby denying documents that it knew or should

have known existed.  Attorney Thomas O'Leary signed discovery responses without conducting a reasonable inquiry as required by Rule 26.  There can be no doubt that Defendants and their attorneys failed to make reasonable inquiries, because Defendants' lead attorneys were able to identify masses of responsive ESI in September and December when they finally inquired of their vendors about the ESI.  These improper certifications contributed to the concealment of documents that were relevant and favorable to Plaintiff, caused unnecessary delay and needlessly increased the cost of litigation.

### a.   **Document Request No. 23**

#### i.   **Request**

Request No. 23 sought documents concerning "the creation, receipt, use, publication and/or distribution of the DOCUMENT entitled 'HM Electronics IQ Structural Failures.'"  (ECF No. 268-15 (Exh. 11) at 16).

#### ii.   **Response**

Defendant asserted objections and then falsely stated that it "may have responsive documents, but is uncertain at this time."  (ECF No. 268-15 (Exh. 11) at 16).  Attorney O'Leary signed this response on October 16, 2013.  (ECF No. 268-27 (Exh. 11) at 10).

#### iii.   **Why Response Was False When Signed**

As of the date Mr. O'Leary signed this response, Defendants knew that they had documents concerning the creation, receipt, use, and distribution of the Structural Failures Report.  Defendant RFT's CEO, Noorian, had reviewed Mr. Sullivan's email and zip file containing these

30

1  very documents on December 6, 2012, as he admitted two years later
2  during a deposition on December 18, 2014.  In his June 11, 2014,
3  deposition, Defendant Noorian testified that he was aware of the
4  Structural Failures Report as of June 5, 2012.  Mr. Noorian and many
5  other RFT executives and marketing personnel participated in emails
6  guiding the creation of the Structural Failures Report.  (*See e.g.*, ECF
7  No. 268-21 (Exh. 14) at 5 (May 5, 2012 email from Mark Sullivan to
8  Philip Tondelli, Scott Crause, Scott Richardson, Jim Voiner, Michael
9  Murdock, with courtesy copy to Michelle Greenwood, Bob Noorian, Tony
10  DeLise, Emilio Roman, Lauren Lenartowski, Fiona Noorian, Jennifer
11  Morales, Barb Heimkamp, and Kay Prosser discussing creation and
12  planned distribution of Structural Failures Report) and ECF No. 288-6
13  (Exh. 16) (Noorian Deposition acknowledging receipt of several similar
14  emails)).  Defendant also should have reviewed its ESI for production in
15  the 10 months since the action had been filed on December 5, 2012.

### iv.   Inquiry Attorneys Should Have Made

17  Attorney O'Leary would have known responsive documents
18  existed had he made a reasonable inquiry.  At the hearing, attorneys
19  O'Leary and Vanderhoof of LeClairRyan LLP argued primarily that it
20  was reasonable to rely on Mr. Noorian's assertions.  They also asserted
21  that it would not have been reasonable to have reviewed all of the ESI
22  at that time.
23  On October 16, 2013, when Mr. O'Leary signed this response to
24  request for document production, the attorneys had not even collected,
25  much less reviewed Defendant RFT's documents.  The evidence in the

31

record shows that Defendant RFT collected ESI in November 2013, after attorney O'Leary had already signed the responses in October 2013, that Mr. O'Leary did not give the data for processing to the ESI vendors until March 2014, and that the processed data was not returned by the vendors for the attorneys to review until after April 2014.

The Advisory Committee Notes on Rule 26(g) explain "the signature certifies that the lawyer has made a reasonable effort to assure that the client *has provided* all the information *and documents* available to him that are responsive to the discovery demand." FED. R. CIV. P. 26, subdivision (g) Advisory Committee Notes (1980 Amendment) (emphasis added). At the time Mr. O'Leary signed this response, he had made no effort to assure that Defendant RFT had provided all the documents to the attorneys. The attorneys did not describe what documents they reviewed at the meeting before the initial responses were signed, how those documents were selected, by whom, or why (or whether) they believed those documents to be representative of the ESI. In the court-ordered meet and confer on February 27, 2014, in response to Plaintiff's question about the methodology used to collect documents in light of the small amount of responsive documents produced, Mr. O'Leary explained simply "I didn't conduct the ESI search, so I don't know the methodology. They were told to look for documents on their computer." (ECF No. 268-27 (Exh. 17) at 23).

Although Mr. O'Leary was not required to review every single page of the ESI before signing the written discovery responses, it was

not reasonable for him to sign the document production responses before the ESI was even collected. The Court recognizes that Mr. O'Leary and his firm did not substitute into the case as lead counsel until one month before signing these responses. Nevertheless, Mr. O'Leary and his firm should have been more transparent with Plaintiff's attorneys about the data collection process and the amount of data involved. Defendant's attorneys should have sought an extension of the time to respond to discovery responses so that the document collection and some sampling could occur prior to certifying responses. Defendant could have filed a motion for protective order or an ex parte discovery motion seeking to extend the time to respond detailing the large amount of ESI, the time and technology constraints, and the Defendant's proposed collection and processing methodology. Instead of familiarizing himself with his client's ESI and embracing transparency and collaboration in the discovery process, lead counsel chose to sign false discovery responses without making any efforts to assure that the responses accurately reflected the Defendant's documents.

It was also not reasonable to sign discovery responses denying the existence of documents based solely on Defendant Noorian's word. While the Advisory Committee Notes on Rule 26(g) do provide that "the attorney may rely on assertions by the client" in making a reasonable inquiry, that is true only "as long as that reliance is appropriate under the circumstances." FED. R. CIV. P. 26, subdivision (g) Advisory Committee Notes (1980 Amendment). Asking Mr. Noorian and accepting his response without asking other employees or collecting or

sampling documents was not reasonable.  The attorneys did not explain what questions they asked Mr. Noorian and the other managers at the pre-response meeting, identify which managers were present, or explain why those particular managers were selected rather than other employees to discuss the existence of responsive documents.  The attorneys did not say whether they asked any of the other managers at their meetings about these documents and how they responded—a critical point, because there were many other executive level RFT employees besides Noorian who knew responsive documents existed. The attorneys should have asked Philip Tondelli, Steve Crause, Steve Combs, Helen Fansler (Executive Assistant), and Fiona Noorian (all of whom were high level employees privy to responsive emails) whether they knew of the existence of documents.  The attorneys could have identified these custodians by virtue of their positions, even without the benefit of reviewing any of the responsive documents.  Even if Defendant Noorian lied to his attorneys or forgot about the existence of documents, a reasonable inquiry made to any of these other custodians would have revealed the existence of responsive documents.

### b.   Document Request No. 26
#### i.   Request

Request No. 26 sought documents between RFT and Panasonic about the Structural Failures Report.  (ECF No. 268-15 (Exh. 11) at 16-17).

12cv2884-BAS-MDD

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

### ii.   Response

Defendant RFT rested on a relevancy objection in refusing to provide documents in response to Request No. 26 for documents between RFT and Panasonic about the Structural Failures Report.  (*Id.* at 16-17).  Attorney O'Leary signed this response on October 16, 2013. (ECF No. 268-27 (Exh. 11) at 10).

### iii.   Why Response Was False When Signed

The relevancy objection, signed by Thomas O'Leary on October 16, 2013, was meritless, because the distribution of the Structural Failures Report to Panasonic by RFT is central to Plaintiff's trade libel claim as alleged in the Complaint filed on December 5, 2012.  The relevance of the distribution of the Report is so obvious that Defendant Noorian sent an email to Mark Sullivan instructing him to stop distributing and destroy the Report in December 2012, soon after Defendant Noorian reviewed the Complaint on December 5, 2012.

### iv.   Supplemental Response

In December 2013 Defendant supplemented: "Responding Party has produced documents responsive to this Request."  (*Id.* at 3). Defendant Noorian signed this response on December 5, 2013 and attorney O'Leary signed this response on December 12, 2013.

### v.   Why Supplemental Response Was False When Signed

Although Defendant had produced some documents by mid-December 2013, it did not produce the most pertinent documents, as made apparent by the documents Defendant produced from September

35

2014, through April 2015, following discovery of the search term/privilege review and data export errors. In fact, as of December 12, 2013, Defendant had only produced 1004 pages of hard copy documents and Mr. O'Leary had not even provided Defendant's ESI to the ESI vendors for processing, much less reviewed it to determine whether any responsive documents remained to be produced.

### vi.   Inquiry Attorneys Should Have Made

Lead counsel should not have certified that all responsive documents had been produced before looking at the client's ESI data. Although lead counsel was not required to examine each page of ESI prior to signing this response, he or his delegates should have sampled the ESI and let Plaintiff's counsel and the Court know that the representation that all responsive documents had been produced was based on a sampling, and informed them of the sampling methodology used. Alternatively, lead counsel could have sought an extension based on a detailed explanation of the proposed methodology and the technological and time constraints necessitating extension.

### c.   Document Request No. 28

### i.   Request

Request No. 28 sought documents concerning RFT's "opinions, statements, and/or declarations regarding the repair frequency of any HME drive-thru product, for the period January 1, 2005 to the present." (ECF No. 268-16 (Exh. 11) at 1).

12cv2884-BAS-MDD

1

### ii.   Response

2   Defendant RFT asserted objections and refused to produce
3   responsive documents on the basis that "it could be thousands of
4   documents every year."  Attorney O'Leary signed this response on
5   October 16, 2013.  (ECF No. 268-16 (Exh. 11) at 1).

6   ### iii.   Why This Response Was Improper

7   This was an improper certification because neither Defendant nor
8   its attorneys had made any inquiry into whether responsive documents
9   existed or how many responsive documents existed at the time Mr.
10  O'Leary signed the response.  The failure to make a reasonable inquiry
11  is patent from the speculative phrase ("could be thousands...") used.  On
12  the date Mr. O'Leary signed this response, Defendant's ESI had not
13  been collected or reviewed.  Defendant was collecting ESI as late as
14  November 2013—one month after this was signed, and Mr. O'Leary did
15  not task the ESI vendor with processing Defendant's ESI until March
16  2014—several months later.  Rather than sign this discovery response
17  refusing to produce documents based on speculation about what their
18  volume might be, Mr. O'Leary should have familiarized himself with his
19  client's data structures and engaged with Plaintiff's counsel and the
20  court in meaningful, collaborative discussions about the volume of ESI,
21  the ESI production methodology, and the timetable required.

22  ### iv.   Supplemental Response

23  Defendant's December 2013 supplemental response stated
24  "Responding Party has no documents responsive to this request."  (ECF
25  No. 268-19 (Exh. 12) at 4-5).  Defendant Noorian certified this response

37

12cv2884-BAS-MDD

on December 5, 2013, and attorney O'Leary signed the response on December 12, 2013.

### v.   Why Supplemental Response Was False When Signed

Defendant's response that it had no documents concerning RFT's "opinions, statements, and/or declarations regarding the repair frequency of any HME drive-thru product" was false.  Mark Sullivan produced emails showing Defendant Noorian knew of such documents no later than December 6, 2012, at his April 1, 2014, deposition.  During Defendant Noorian's June 11, 2014, deposition, he admitted that he was aware of the Structural Failures Report and internal emails containing opinions and statements about HME's repair frequency as of June 5, 2012.  (ECF No. 288-6 (Exh. 16) at 5-6).  From September 2014, through April 2015, after discovery of the search term/privilege review and data export errors, Defendant produced hundreds of responsive documents.  The late-produced documents and Defendant Noorian's limited purpose deposition show Defendant Noorian knew this response was false when he signed it on December 5, 2013, because he had personally reviewed Mark Sullivan's December 6, 2012, email and zip file containing responsive documents one year earlier.

### vi.   Inquiry Attorneys Should Have Made

As explained in the preceding sections, Mr. O'Leary's reliance on Defendant Noorian's assertions was not reasonable under the circumstances.  Mr. O'Leary should have identified other key employees and asked them whether responsive documents existed.  As Defendant

12cv2884-BAS-MDD

Noorian himself admitted during the limited purpose deposition, he cannot control 60 employee's behavior. While Mr. O'Leary did not have to ask every employee whether they had made such statements in writing, it was unreasonable to only ask one person. A reasonable inquiry would have involved asking a few key employees, including at least one marketing employee. Mr. O'Leary also should have made sure at least some sampling of ESI was reviewed before certifying that no responsive documents existed. So certifying before the ESI had even been processed, much less sampled or reviewed, was not reasonable.

### d.    Interrogatory No. 13

#### i.    Request

Interrogatory No. 13 demands: "identify all persons to whom you provided the 'HM Electronics IQ Structural Failures' document or any of the contents set forth therein." (ECF No. 268-11 (Exh. 8) at 6).

#### ii.    Response

Defendant RFT objected and stated that Mark Sullivan, who was no longer employed with RFT, could identify such persons. (*Id.* at 6). Defendant Noorian signed the interrogatory responses under penalty of perjury on October 18, 2013, and attorney O'Leary signed the discovery responses on October 16, 2013. (*Id.* at 9, 10).

#### iii.    Why This Response Was False

This response was false because Defendant could have identified the recipients and knew that Mark Sullivan was not the only person who could do so. The ESI productions by RFT from September 2014, through April 2015, included emails that RFT had at the time and could

39

have used to compile a list of recipients or produced in lieu of compiling
a list.  ESI also showed that Defendants knew Mark Sullivan was not
the only RFT employee who distributed the Report.  (ECF No. 288-16
(Exh. 34)).  The documents show Defendant Noorian attended a July
2012 meeting, and that Defendant Noorian personally reviewed Mark
Sullivan's documents showing distribution in December 2012.  Despite
acquiring knowledge of responsive documents in July and December
2012, Defendant Noorian signed the interrogatory responses under
penalty of perjury.

### iv.   **Supplemental Response**

Defendant also supplemented this responses after Plaintiff
challenged their sufficiency.  (ECF No. 268-12 (Exh. 9)).  Defendant
Noorian signed the supplemental responses on December 5, 2013, and
James C. Hildebrand signed them for Thomas O'Leary on December 12,
2013.  (*Id*.).  Defendant revised Interrogatory No. 13 to insist that
"Mark Sullivan is the only person with knowledge to whom, if anyone,
the 'HM Electronics IQ Structural Failures' document was distributed."
(*Id*. at 6).

### v.   **Why The Supplemental Response Was False**

Mark Sullivan was not the only person with knowledge of to whom
the Report had been distributed, and Defendants Noorian and RFT
knew it at the time this supplemental response was signed.  Many RFT
executives and employees, including Noorian, had knowledge to whom
the Report was distributed as a result of participation in the July 3,
2012, Panasonic meeting.  Defendant Noorian and Helen Fansler also

40

12cv2884-BAS-MDD

1   knew of its distribution from Defendant Noorian's review of Mark
2   Sullivan's December 2012, email and zip file.  Michael Murdock, RFT's
3   Regional Sales Manager, also had knowledge of the Report recipients,
4   because he personally emailed the Report to at least one prospect.
5   (ECF No. 288-16 (Exh. 34)).

6                    **vi.   Inquiry Attorneys Should Have Made**
7         Before certifying these responses stating that only Mark Sullivan
8   could identify the recipients of the Report, lead counsel should have
9   asked other RFT employees besides Defendant Noorian, including at
10  least one marketing employee.  The attorneys also should have
11  conducted an initial review or sampling of documents.  The attorneys
12  also should have worked with opposing counsel and the court in a
13  transparent and collaborative manner to obtain an extension of time to
14  adequately review documents.

15                    **e.   Interrogatory No. 20**
16                    **i.   Request**
17        Interrogatory No. 20 requested: "identify all person(s) with
18  Panasonic who may have knowledge regarding the content and
19  distribution of the 'HM Electronics IQ Structural Failures' document."
20  (ECF No. 268-11 (Exh. 8) at 8-9).

21                    **ii.   Response**
22        On October 16, 2013, RFT's lead counsel Thomas O'Leary signed
23  interrogatory responses that included only objections in response to this
24  request.  (*Id.* at 9).  Defendant objected that the request was vague,
25  ambiguous and burdensome, that it sought irrelevant information, and

41

that it sought information in the control of third parties and not available to Defendant.

### iii.   Why This Response Was Improper

These objections were frivolous and false when made.  The identity of Panasonic employees who had knowledge of the Report was relevant to the action, and this interrogatory was an appropriate way for Plaintiff to identify who at Panasonic—a large company and one of Plaintiff's competitor's—might have discoverable information.  Defendant's objection that the information was not available to it was false, and it knew that response to be false when made.  Noorian and other RFT employees had such knowledge from their direct participation in the July 3, 2012, meeting with Panasonic and post-meeting emails, as shown by a July 16, 2012, email produced on September 26, 2014.  (ECF No. 288-7 (Exh. 21)).

### iv.   Supplemental Response

Defendant doubled-down on its response to Interrogatory No. 20, supplementing that RFT "is unaware of any person at Panasonic who may have knowledge regarding the content and distribution of the 'HM Electronics IQ Structural Failures' document."  (ECF No. 268-12 (Exh. 9) at 7).  The supplemental response was signed by Defendant Noorian on December 5, 2013, and by James Hildebrand for Thomas O'Leary on December 12, 2013.  (Id. at 7-8).

### v.   Why The Supplemental Response Was False and Made Without Reasonable Inquiry

That statement was also false.  Noorian and other RFT employees had knowledge from their direct participation in the July 3, 2012, meeting with Panasonic and post-meeting emails, as shown by a July 16, 2012, email produced on September 26, 2014.  (ECF No. 288-7 (Exh. 21)).

### vi.   Inquiry Attorneys Should Have Made

Mr. O'Leary's certification was made without reasonable inquiry. Before certifying these responses stating that only Mark Sullivan could identify the recipients of the Report, lead counsel should have asked other RFT employees besides Defendant Noorian, and should have asked at least one marketing employee.  The attorneys also should have conducted an initial review or sampling of documents.  The attorneys also should have worked with opposing counsel and the court in a transparent and collaborative manner to obtain an extension of time to adequately review documents.

### f.   Interrogatory No. 23

### i.   Request

Interrogatory No. 23 called for Defendants to identify the participants, date, and location of any meetings from January 1, 2012, to the present between RFT and Panasonic where HME was discussed. (ECF No. 288-8 (Exh. 22) at 9).

43

12cv2884-BAS-MDD

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

### ii.    Response and Supplemental Response

At first, Defendants provided only frivolous objections, and then supplemented this response in August 2014, by insisting that only Mark Sullivan and Lillia Tuschuk had knowledge of any meetings, if any occurred.  (ECF No. 269-2 (Exh. 23) at 10-11).  The responses were signed July 9, 2014, by Defendant Noorian and attorney Thomas O'Leary.  (ECF No. 288-8 (Exh. 24)).  The supplemental responses were signed by Defendant Noorian on August 22, 2014, and by attorney O'Leary on August 21, 2014.  (ECF No. 269-2 (Exh. 23) at 10-11).

### iii.    Why Responses Were False

In fact, Defendant Noorian himself attended at least one such meeting with Panasonic on July 3, 2012, along with Philip Tondelli, Mark Sullivan, Michelle Greenwood, and Allen Hege of RFT.  (ECF No. 288-7 (Exh. 21)).  This meeting only came to light when Defendant finally produced an email chain exposing the meeting on September 26, 2014.  (*Id.*).  The email was distributed amongst Michelle Greenwood, Philip Tondelli, Michael Murdock, Mark Sullivan, and Panasonic personnel on July 16, 2012.  (*Id.*).  The attachments summarize the meeting, list the participants, note Defendant Noorian's direct participation in the meeting, describe discussions about Plaintiff's headset repair rates, durability, and quality, and note that Mr. Sullivan provided and discussed a document, the description of which matches the Structural Failures Report.  (*Id.*).

Before this Court, at the hearing on the instant motions, Defendants' attorneys asserted that Defendant Noorian did not

44

remember this meeting at the time, and that he only attended the first few minutes of the meeting.  Defendants did not offer a declaration from Noorian attesting to these statements.  Even if Defendant Noorian only attended a few minutes of this meeting, that does not excuse Defendant or its attorneys from consulting other high level executives, marketing employees, or document custodians to determine if RFT had attended such meetings through employees besides Mr. Noorian.  The response was false when made, and a reasonable inquiry of other key RFT employees would have revealed the truth.

### g.    Offensive Use of False Discovery Responses

Defendants and their attorneys also used the false discovery certifications as a weapon to ward off further inquiry into the sufficiency of the document production.  For instance, in its April 14, 2014, opposition to Plaintiff's motion to compel further production of documents, Defendant argued:

> For several of HME's document requests, RFT's counsel has also unequivocally indicated that it does not possess responsive documents.  In other words, RFT cannot produce documents it does not have.  …RFT has conducted multiple diligent electronic searches, has scavenged for numerous documents, and has run several reports in order to provide HME with responsive documents.

(ECF No. 125 at 5, 6:20-26).  There can be no question now that the false responses and improper objections were interposed for the improper purpose of concealing these critical documents, causing

1   unnecessary delay, or increasing the cost of litigation, and were made

2   without anything remotely approaching "reasonable inquiry."[3]

### h.    Sanctions Are Warranted

4       Had Defendant correctly answered these discovery requests,

5   Plaintiff would have been able to root out the non-production of the

6   email confirming the meeting earlier during discovery.  Defendants and

7   their attorneys, by certifying these improper responses, concealed the

8   existence of documents that they knew or should have known existed,

9   causing unnecessary delay and needlessly increasing the cost of

10  litigation.

11      The Court finds that it must impose appropriate sanctions against

12  Defendants Noorian and RFT for improper certifications of the following

13  responses: Request for Production of Documents Responses Nos. 25, 26

14  and 28; Interrogatory Responses 13, 20 and 23.  Further, the Court

15  must impose appropriate sanctions against attorney Thomas O'Leary

16  and Defendant RFT for improper certifications of the following

17  responses: Requests for Production Responses Nos. 23, 25, 26 and 28;

18  Interrogatories Nos. 13, 20 and 23.

19

20

21

22  _____

23  [3] Defendant's use of the improperly certified discovery responses to

24  conceal documents and evade sanctions was an abuse of discovery and
    fraud upon the court.  Though Rule 11 sanctions may be warranted for

25  this and similarly false filings noted herein, the Court declines to
    consider Rule 11 sanctions in this instance.

12cv2884-BAS-MDD

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**2. Rule 37**

**a.    Current Rule 37**

When considering sanctions under Rule 37, courts generally consider three factors: "(1) the degree of fault of the party who altered or destroyed the evidence; (2) the degree of prejudice suffered by the opposing party; and (3) whether there is a lesser sanction that will avoid substantial unfairness to the opposing party." *Apple v. Samsung*, 888 F.Supp.2d 976, 992 (N.D. Cal. 2012) ("*Apple II*").

As Rule 37 is currently applied in the Ninth Circuit, "a party's destruction of evidence need not be in 'bad faith' to warrant a court's imposition of sanctions." *In re Napster, Inc. Copyright Litigation*, 462 F.Supp.2d 1060, 1066 (9th Cir. 2006) (citing *Glover v. BIC Corp.*, 6 F.3d 1318, 1329 (9th Cir. 1993)).  District courts may impose sanctions against a spoliating party that merely had "simple notice of 'potential relevance to the litigation.'" *Glover*, 6 F.3d at 1329 (quoting *Akiona v. United States*, 938 F.2d 158, 161 (9th Cir. 1991)).

**i.    Fault**

**a. Failure to Implement Litigation Hold**

Attorneys have a duty to effectively communicate a "litigation hold" that is tailored to the client and the particular lawsuit, so the client will understand exactly what actions to take or forebear, and so that the client will actually take the steps necessary to preserve evidence. *The Pension Comm., supra*, 685 F.Supp.2d at 462; *Philips Electronics North America Corp. v. BC Technical*, 773 F.Supp.2d 1149, 1195, 1204-1206 (D. Utah 2011) (litigation hold must be directed to

47

appropriate employees, must be conveyed in a manner that ensures recipients read and follow it, must tell them what the case is about, and must identify categories of documents to be preserved).

Indeed, the Advisory Committee Notes on the proposed new Rule 37(e) advises "[i]t is important that counsel become familiar with their clients' information systems and digital data—including social media—to address [preservation issues]." The attorney must learn their client's organizational structure and computer data structure in order to adequately advise the client of the duty and method for preserving evidence. *See, e.g.*, *Qualcomm Inc. v. Broadcom Corp.*, No. 05CV1958-B-BLM, 2010 WL 1336937, at \*2-\*3 (S.D. Cal. Apr. 2, 2010). After a litigation hold has been implemented, counsel has a continuing duty to monitor a client's compliance with a litigation hold. *Zubulake v. Warburg, LLC*, 229 F.R.D. 422, 423 and 431-432 (S.D.N.Y. 2004) *(Zubulake V)*.

The State Bar of California recently issued a Formal Opinion that advises: "Prompt issuance of a litigation hold may prevent spoliation of evidence, and the duty to do so falls on both the party and the outside counsel working on the matter." California State Bar Formal Opn. No. 2015-193 at 3 n.6. Though the opinion is new, the principles and guidance in the opinion are not new. The Opinion summarizes,

> Attorneys handling e-discovery should be able to perform (either by themselves or in association with competent counsel or expert consultants) the following:
>
> • Initially assess e-discovery needs and issues, if any;

12cv2884-BAS-MDD

- *Implement/cause to implement appropriate ESI preservation procedures*;
- *Analyze and understand a client's ESI systems and storage*;
- *Advise the client on available options for collection and preservation of ESI*;
- *Identify custodians of potentially relevant ESI*;
- Engage in competent and meaningful meet and confer with opposing counsel concerning an e-discovery plan;
- Perform data searches;
- *Collect responsive ESI in a manner that preserves the integrity of the ESI*; and
- Produce responsive non-privileged ESI in a recognized and appropriate manner.

*Id.* at 3-4 (emphasis added).

Defendants' attorneys ignored these basic principles. Defendants' attorneys apparently never sent Defendants a "litigation hold" letter— much less one tailored to the data and organizational structures of this client. Defendants' lead counsel never learned the infrastructure of the Defendant's ESI nor advised Defendants on the proper methodology for searching ESI, and did not monitor compliance. Defendant Noorian and Mr. O'Leary should both have been key players in data collection, yet both claim to have had no involvement in gathering ESI. To the extent lead counsel chose to delegate its data preservation and litigation hold duties, it was incumbent on lead counsel to supervise the employees and attorneys to whom those duties were delegated. *See, e.g., id.* at 5 (describing duty to supervise delegates).

1    Yet, even after the client was ordered to conduct an ESI search,

2  and while assuring the court and opposing counsel that an ESI search

3  had occurred, Thomas O'Leary could not answer simple questions about

4  the ESI search methodology used.  (ECF No. 268-27 (Exh. 17) at 23).

5  Worse, he disavowed any involvement or knowledge of the search

6  methodology.  (*Id*.).  It is no surprise Mr. O'Leary could not answer

7  questions about the ESI search methodology used; it had not even

8  begun.  It was not until the next month that Mr. O'Leary himself tasked

9  the vendor who later performed the ESI searches.  The record shows

10  that lead counsel remained hands-off while and after the ESI searches

11  occurred.  And there is nothing in the record to suggest Defendants'

12  attorneys ever instructed Defendants to not destroy documents that

13  could be relevant to this action.  The attorneys' total abdication of their

14  obligation to communicate the duty to preserve evidence to their clients

15  in an effective manner warrants severe sanctions.

## b. Intentional Destruction of ESI

16    It is well established that litigants must preserve all potentially

17  relevant records as soon as they become aware that a case may be filed.

18  *See e.g., Zubulake v. UBS Warburg LLC*, 2003 WL 22410619, *2

19  (S.D.N.Y. October 22, 2003) (*Zubulake IV*); *Zubulake V, supra*, 229

20  F.R.D. 422; *Philips Electronics North America Corp., supra*, 773

21  F.Supp.2d at 1195; *Thompson v. U.S. Dept. of Housing and Urban

22  Development*, 219 F.R.D. 93, 99-100 (D. Md. 2003).  Defendants do not

23  dispute—and the evidence shows—that after learning about this

50

1   lawsuit, Defendants specifically instructed employees to destroy highly

2   relevant documents because of their relevance to Plaintiff's claims.

3          Defendants argue that the spoliation was not intentional.  They

4   contend that "RFT produced over 1 million pages of information," and

5   the "small fraction of that information that was produced recently does

6   not support inferences of misconduct."  (ECF No. 288 at 56:3-5).

7   Defendants' exaltation of form over substance is misguided.  "Producing

8   1.2 million pages of marginally relevant documents while hiding 46,000

9   critically important ones does not constitute good faith and does not

10  satisfy either the client's or attorney's discovery obligations."

11  *Qualcomm Inc. v. Broadcom Corp.*, No. 05cv1958-B-BLM, 2008 WL

12  66932, at *1 (S.D. Cal. Jan. 7, 2008), *vacated in part*, No. 05cv1958-

13  RMB-BLM, 2008 WL 638108 (S.D. Cal. Mar. 5, 2008).  The volume of

14  Defendants' production does not relieve them of fault.

15         Defendants also claim that they are not at fault because

16  Defendant Noorian did not really mean "destroy," but instead meant

17  that his sales force should stop distributing the document outside of the

18  company.  Defendants' contention contradicts the unequivocal command

19  in Defendant Noorian's email.  Though Defendant Noorian also stated

20  that he did not "want anyone at RFT using the HME failure pictures

21  effective immediately," that does not negate the mandate to "destroy

22  any electronic or printed copies any of you may have" that followed.

23         The only support for Defendants' position is Defendant Noorian's

24  self-serving interpretation delivered during the limited purpose

25  deposition held after this motion was filed.  Defendant Noorian could

1   not explain during deposition why he issued the "destroy" command

2   when it would have been just as easy and effective to issue an

3   instruction to stop distributing the documents.  Defendants' testimony

4   that Defendant Noorian's motive was "to make sure the 'damn thing'

5   wasn't sent out again," is also inconsistent with a Panasonic marketing

6   employee's testimony, delivered by a disinterested party before the

7   issue of sanctions arose, that Defendants never requested that

8   Panasonic stop distributing the materials.  (ECF No. 288 at 63; ECF

9   No. 288-4 (Exh. 7) 14:18-22).  If Defendants' intention was to curtail the

10  distribution of the Report, as opposed to intentionally destroying

11  relevant evidence, then it follows that they would have asked Panasonic

12  to stop distributing the Report.

13          Moreover, Defendant Noorian approved Mr. Sullivan's act of

14  letting "the other guys know" to destroy the documents.  And Defendant

15  Noorian never clarified his intention to the employees who received the

16  instruction.  As a result, Mark Sullivan instructed Philip Tondelli and

17  Michael Murdock both to "destroy our copies of this *and* do not send it

18  out for any further reasons."  (ECF No. 288-15 (Exh. 33) (emphasis

19  added)).  All of this occurred on December 19, 2012, after the duty to

20  preserve evidence arose.

21          Even setting aside whether Defendant Noorian actually intended

22  that documents be destroyed, the sales force would not have understood

23  his unambiguous command as anything less than a directive to destroy

24  the Structural Failures Report and related documents.  There is

25  nothing to suggest the sales staff failed to carry out the "destroy"

command in this instance.  Defendants do not offer a declaration from employees stating that they did not delete emails, or they only deleted certain types of documents.  There is also nothing in the record to suggest Defendant Noorian made any attempt to modify or retract the "destroy" instruction.  There is no evidence that the employees had been advised of a litigation hold.  Defendants have produced no evidence to support their speculation that only duplicate copies of the Structural Failures Report were deleted.  The Court concludes that Defendant Noorian intended for RFT's sales force to destroy relevant documents.

Finally, the evidence shows that Defendants have not ever produced a complete version of the attachments to the December 6, 2012, Mark Sullivan email, and Defendants have not been able to identify all of the documents referenced in the five screen shots.  The absence of these documents, combined with the surrounding circumstances, raises the reasonable inference that Defendants deleted other documents including or referencing the HME failure pictures that are relevant to this action and favorable to Plaintiff.  This Court concludes that Defendants deleted relevant evidence intentionally and in bad faith.

### c. Withholding Non-privileged Documents As Privileged

It is fundamental that litigants must produce responsive non-privileged documents in a timely manner.  Attorneys have a corresponding duty to supervise associates, staff, and contractors who are involved in the document collection, review, and production process.

1  When attorneys employ "keywords or any other technological solution to

2  ediscovery, *counsel must design an appropriate process*, including use of

3  available technology, *with appropriate quality control testing*, to review

4  and produce relevant ESI while adhering to Rule 1 and Rule 26(b)(2)(C)

5  proportionality."  *Rio Tinto PLC v. Vale S.A.,* 306 F.R.D. 125, 126

6  (quoting *Da Silva Moore v. Publicis Groupe & MSL Grp.*, 287 F.R.D.

7  182, 193 (S.D.N.Y.2012)) (emphasis added).  The State Bar of

8  California's Formal Opinion No. 2015-193 confirms that attorneys have

9  long had a "duty to supervise the work of subordinate attorneys and

10  non-attorney employees or agents," and that this "duty to supervise can

11  extend to outside vendors or contractors, and even to the client itself."

12  California State Bar Formal Opn. No. 2015-193 at 5.  The attorneys'

13  duty to supervise the work of consultants, vendors and subordinate

14  attorneys is non-delegable.  *Id.*  "An attorney must maintain overall

15  responsibility for the work...," and,

> must do so by *remaining regularly engaged* in the
> expert's work, by *educating everyone involved in the e-discovery workup about the legal issues in the case, the factual matters impacting discovery, including witnesses and key evidentiary issues, the obligations around discovery imposed by the law or by the court*, and of any relevant risks associated with the discovery tasks at hand.  *The attorney should issue appropriate instructions and guidance and, ultimately, conduct appropriate tests* until satisfied that the attorney is meeting his ethical obligations prior to releasing ESI.

*Id.* (emphasis added).

Counsel must also prepare and provide to opposing counsel a privilege log if documents are withheld as privileged.  FED. R. CIV. P. 26(b)(5)(A); *see also Brown v. Tellermate Holdings Ltd.*, No. 2:11-CV-1122, 2014 WL 2987051, at *11 (S.D. Ohio July 1, 2014) (noting that party that failed to produce privilege log had waived all claims of privilege).

The Court finds that sanctions against Defendant RFT and its attorneys, LeClairRyan LLP and Thomas O'Leary, are appropriate for this misconduct under Rule 37.  Although the Court will not sanction attorneys Brian Vanderhoof of LeClairRyan LLP and Mark Goldenberg of Goldenberg Heller Antognoli & Rowland, P.C., their conduct deserves a dishonorable mention.

Though this tardy document production resulted from Defendants' attorneys' failure to oversee assisting attorneys, Defendants[4] share fault.  First, "[a]ny attempt by [the sanctionee] to argue that the district court abused its discretion in preventing [the sanctionee] from passing the blame to its attorneys is unavailing.  [A sanctionee] 'is deemed bound by the acts of its lawyers and is considered to have 'notice of all

_____

[4] Defendant Noorian objects on the basis that Rule 37 sanctions cannot be imposed against him personally, because Magistrate Judge Burkhardt's order was only issued against Defendant RFT.  (ECF No. 185 at 1 (Order); ECF No. 308 at 21 (argument)).  Perhaps because Defendant never raised this argument until the supplemental brief, Plaintiff offers no counterpoint.  Because the Court finds that Defendant Noorian can be sanctioned under Rule 26(g)(3), the Court does not reach the issue of whether Defendant Noorian can be sanctioned under Rule 37.

55

12cv2884-BAS-MDD

1   facts, notice of which can be charged upon the attorney.'"" *Haeger,*

2   *supra*, --F.3d-- at 25 (quoting *Link v. Wabash R. Co.*, 370 U.S. 626, 634

3   (1962), and citing *Lockary v. Kayfetz*, 974 F.2d 1166, 1169-1170 (9th Cir.

4   1992)).  Second, Defendants ignored red flags and signed discovery

5   responses and declarations that contained what turned out to be false

6   and misleading statements about the existence of these documents.

7        Defendant Noorian, on behalf of Defendant RFT, concealed the

8   existence of the missing documents when he verified incorrect written

9   discovery responses denying the existence of some documents, denying

10  that meetings with Panasonic occurred, and identifying Mark Sullivan

11  as the only employee involved in the alleged misconduct.  Had

12  Defendant Noorian acknowledged his involvement in the underlying

13  events, Defendants' attorneys and the court may have been more

14  vigilant when documentation of his involvement did not surface.  Also,

15  the evidence shows Defendant Noorian was involved in the collection of

16  documents for production and that he reviewed the very documents

17  Defendants have not been able to find in their production immediately

18  after learning of this lawsuit.  Yet he made no effort to ensure that

19  these highly probative documents were produced.

20       When Plaintiff complained that the December 6, 2012, email and

21  zip file from Mark Sullivan to Defendant Noorian had not been

22  produced, Defendants dug in their heels rather than review their

23  production for errors.  Steve Combs signed a declaration stating under

24  penalty of perjury that all documents had been produced, even though a

25  cursory investigation would have revealed otherwise.

The Court further finds Thomas O'Leary and LeClairRyan LLP responsible for the delayed productions.  Defendants' lead counsel delegated critical discovery tasks, without appropriate monitoring or quality control, to temporarily-involved attorneys who made the unreasonable decision to withhold responsive documents as privileged on the sole basis that they contained words like "confidential," then compounded the problem by not reviewing the documents withheld as privileged and not creating a privilege log of the excluded documents. Had Defendants' counsel reviewed even a sample of the documents set aside as privileged the error would have been obvious.  It is alarming that lead counsel aggressively defended this fundamentally-flawed ESI production despite Plaintiff's persistent calls for more documents, a review of methodology, and a privilege log.  In addition, the Court is alarmed by Defendants' counsel's refusal to take any responsibility for the errors.

At the hearing, attorney Vanderhoof argued that LeClairRyan and Mr. O'Leary should not be held responsible for this error, because the paralegals at the temporarily-involved firm did not tell the LeClairRyan attorneys that there were documents that needed review, and there was some chaos caused by the transitioning between firms.

This excuse shows LeClairRyan attorneys did not, and still do not, comprehend that it is their duty to become actively engaged in the discovery process, to be knowledgeable about the source and extent of ESI, and to ensure that all gathered data is accounted for, and that these duties are heightened—not diminished—when there is a

57

1    transition between firms or other personnel critical to discovery.  As

2    lead counsel, Thomas O'Leary and LeClairRyan LLP should have asked

3    the paralegals at the temporarily-involved firm about the privilege

4    review, including whether one was conducted, what privilege review

5    methodology was used, the amount and type of documents withheld as

6    privileged, and the updating of the privilege log.  Lead counsel should

7    have asked the paralegals about whether there were any additions to

8    the privilege log, which Thomas O'Leary had signed on February 14,

9    2014. (ECF No. 125-3 at 4).  When attorney O'Leary signed the

10   privilege log, it had 21 entries, after approximately 18,500 pages had

11   been produced.  (ECF No. 125 at 17, 125-13).  Lead counsel should have

12   been suspicious that no additional documents were being withheld for

13   privilege after approximately 330,000 pages of ESI were produced,

14   given that the earlier smaller production had resulted in 21 privileged

15   documents.

16            Further, lead counsel was present at Mark Sullivan's and

17   Defendant Noorian's depositions, and should have been surprised and

18   concerned when Plaintiff's counsel used as exhibits documents that

19   Defendants should have had in their ESI but had not produced.

20            Lead counsel also should have noticed that the amount of data Mr.

21   O'Leary provided to the ESI vendors did not approximate the data

22   returned to the attorneys.  Lead counsel had access to numbers that

23   they should have noticed did not add up.

24            Plaintiff noticed these red flags and waved them.  This shows that

25   the inconsistencies were obvious to anyone paying attention.  Plaintiff's

12cv2884-BAS-MDD

protests are yet another flag that Defendants' attorneys should not have ignored.  Instead of inquiring further of its vendors, lead counsel chastised Plaintiff for its diligence.  The ease with which lead counsel could have discovered this problem is revealed by how quickly and easily the problem was discovered when Mr. Vanderhoof finally did make inquiries to the vendors.

Thomas O'Leary of LeClairRyan was the attorney who initially provided the raw ESI to the vendor Setec, and, as lead counsel, it was incumbent on him and his firm to remain involved in the data processing as necessary to ensure that the data the given to the vendors roughly equated to the data returned by the reviewing attorneys and vendors, and to notice when no privileged documents were added to the privilege log he had signed after a large ESI production.  Though attorneys Goldenberg and Vanderhoof also abdicated their duties and were also involved in the discovery conferences, depositions, and the ESI process, as lead counsel, the responsibility falls on Mr. O'Leary and his firm.

### d. __Post-Discovery Document Dump__

Rule 37 sanctions are also appropriate against Defendant RFT and its attorneys for the post-discovery document dump of more than half of the documents they ultimately produced in this action, which they admit should have been produced much earlier.  Defendant RFT—despite sworn assurances that it had already complied with Magistrate Judge Burkhardt's Order requiring completion of its document production by August 4, 2014—failed to produce well over 375,000

pages of responsive documents until after the filing of this motion and the close of discovery.

Defendants explain the bulk of the documents were inadvertently withheld because the ESI vendor accidentally failed to export all of the data to be produced.  (ECF No. 269-28 (Stefan Decl.) ¶ 5).

The data export error is strikingly similar—but even more egregious—than the uploading error that occurred in *In re Delta/AirTran Baggage Fee Antitrust Litigation*, 846 F.Supp.2d 1335, 1342 (N.D. Ga. 2012).  In that case, Delta's attorney instructed Delta's IT department to upload the custodian's hard drives to Clearwell, the document management and search tool they were using for document production.  Two weeks later, Delta's attorney followed up with the IT department to make sure all of the data that had been collected had indeed been uploaded to Clearwell.  Despite confirmation from the IT department, not all of the data had been uploaded.  The uploading error, combined with a failure to review two hard drives and backup tapes, resulted in the late production of 60,000 pages of documents. The *In re Delta* court found fault and prejudice, and exercised its authority under Rule 37 to reopen discovery and impose monetary sanctions, including the moving party's reasonable costs and attorneys' fees, against Delta.  Likewise, this Court finds Defendants and their attorneys at fault for failing to monitor the document production and the ESI vendor.  The error was concealed and compounded by their blind assurances that all documents had been produced.

60

12cv2884-BAS-MDD

1    Moreover, Defendants and their attorneys are at fault for the

2 delay in producing the May 2015 data set.  Defendants' attorneys

3 attribute the delay in producing the May 2015 document subset to four

4 problems: 1) the ESI vendor mistakenly did not provide a subfolder of

5 data it had prepared when investigating its prior error in December

6 2014, 2) data searches did not include Mark Sullivan's

7 "business.management" email address, 3) data searches did not include

8 the term "attune," and 4) non-privileged attachments to privileged

9 emails were withheld in error.  (*Id.*).

10    Counsel claims they did not search (or instruct vendors to search)

11 Mark Sullivan's "business.management" email account, because counsel

12 was unaware that Mark Sullivan used both the "MarkS" and the

13 "business.management" email addresses.  Counsel should have known

14 to search the "business.management" address because Mark Sullivan

15 produced emails with that address during his deposition in April 2014.

16 (ECF No. 268-21 (Exh. 14)).  Defendants knew Mr. Sullivan used the

17 address, because Defendant RFT issued it to him and Defendant

18 Noorian reviewed emails Mr. Sullivan sent using that address in the zip

19 file on December 6, 2012.  (*Id.*).  Defendant and counsel should also

20 have known to include "attune" as a search term in their ESI

21 production, because that is the term Mark Sullivan used in his email

22 and zip file search.  Defendant Noorian knew this from his December 6,

23 2012 review of Mark Sullivan's files, and Defendants attorneys, and Mr.

24 O'Leary and Mr. Goldenberg specifically, should have known this after

25

61

1  Mark Sullivan produced the documents relying on attune as a search
2  term.

3      The Court concludes that Defendants and their attorneys are at
4  fault for the post-discovery document dump.  Mr. O'Leary and his firm's
5  abdication of their roles in crafting and implementing an effective
6  discovery process warrants sanctions.  Mr. Goldenberg's efforts fell
7  woefully short of his responsibilities to ensure an ESI methodology was
8  crafted that adequately captured responsive data, particularly because
9  Mr. Goldenberg was the only attorney involved from the start and had a
10 long-time relationship with Defendants that granted him familiarity
11 with Defendants and their data.  Mr. Vanderhoof also failed in his duty
12 to craft, implement, and test a reasonable ESI protocol.  Nevertheless,
13 the Court finds sanctions are not warranted against Mr. Goldenberg
14 and Mr. Vanderhoof personally.

15                    **ii.   Prejudice**

16     The Court finds that sanctions are necessary because Plaintiff was
17 precluded by Defendants' conduct from fully discovering the extent and
18 impact of distribution of the Structural Failures Report and average
19 repair rate information.  Prejudice is determined by evaluating whether
20 the spoliating party's actions impaired the non-spoliating party's ability
21 to go to trial, threatened to interfere with the rightful decision of the
22 case, or forced the non-spoliating party to rely on incomplete and spotty
23 evidence.  *In re Hitachi Television Optical Block Cases*, No. 08cv1746-
24 DMS-NLS, 2011 WL 3563781, *6 (S.D. Cal. August 12, 2011) (citing
25 *Leon v. IDX Systems Corp.*, 464 F.3d 951, 959 (9th Cir. 2006)).

Spoliation of evidence raises the presumption that the destroyed evidence goes to the merits of the case, and that such evidence was adverse to the party that destroyed it. *Apple II, supra,* 888 F.Supp.2d at 998 (citing *Hynix Semiconductor v. Rambus,* 591 F.Supp.2d 1038, 1060 (N.D. Cal. 2006), *vacated on other grounds in* 645 F.3d 1336 (D.C. Cir. 2011)).

Defendants contend that sanctions are not appropriate, because the documents have now all been produced and trial has yet to occur, or will not occur because of the anticipated settlement.

Plaintiff counters that not all documents have been produced and it has been "exceedingly difficult for HME to identify sales it may have lost as a result of" Defendants' distribution of the Structural Failures Report and related information, because the spoliation prevented Plaintiff from identifying all of the recipients.

Defendants respond that Plaintiff was able to identify hundreds of customers or potential customers in Plaintiff's opposition to Defendants' summary judgment motion.  Indeed, in opposition to the summary judgment motion, Plaintiff's expert declared that he was provided lists of "overlapping customers," which included HME customers or prospects who made purchases from RFT or Panasonic for the first time while the trade libel is alleged to have occurred.  (ECF No. 275-1 ¶6-9).

Plaintiff could have used these lists to identify sales lost to Defendant RFT and Panasonic, but the overlapping customer lists are useless for determining sales lost to other competitors.  And the Report may be in the hands of potential customers who had not yet made a

purchase from RFT and Panasonic when the overlapping customer lists were prepared.  Although the difficulty in identifying lost sales attributable to the missing documents has been alleviated by the overlapping customer lists, the prejudice has not been cured.  It remains unknown how widely the Structural Failures Report was distributed, to whom, and how it influenced their purchasing behavior.

Plaintiff also emphasizes that Defendant did not produce the Sullivan email and attached zip file until April 14, 2015, and that it is incomplete.  Defendants' inability to find documents known to be missing raises the unrebutted presumption that other unidentified relevant documents that are favorable to Plaintiff are also missing.  Even if Defendants have now completed production of all non-destroyed documents, Defendants did not do so until months after the close of discovery.  As a result, Plaintiff did not have the benefit of those documents while selecting deponents, taking depositions, conducting third party discovery, and preparing its trial strategy and pre-trial documents.  Plaintiff has had to divert resources to pursuing the missing documents and reviewing—on an expedited basis—the documents Defendant dumped on Plaintiff at the last minute.  The diversion of resources necessitated by the spoliation distraction creates a further "risk of erroneous judgment on this claim."

In addition, Plaintiff has expended significant resources in compelling Defendants to comply with their discovery obligations.  Plaintiff conservatively estimates its costs and fees at approximately $52,000.  Defendants and their attorneys have made no offer to

voluntarily cover any of the Plaintiff's costs and fees that were necessitated by the discovery problems.

On the other hand, the fact that Plaintiff did not ask the Court to re-open discovery suggests that Plaintiff's ability to go to trial is no longer impaired. It may also be that evidence that Plaintiff would have obtained absent Defendants' misconduct would merely be cumulative of the evidence Plaintiff now has.

The Court concludes Defendants' spoliation has not impaired Plaintiff's ability to go to trial, but has *threatened* to interfere with the rightful decision of the case, and may force Plaintiff to rely on incomplete and spotty evidence. *See Leon, supra,* 464 F.3d at 959.

Consequently, the Court finds Defendant RFT and its attorneys responsible under Rule 37 for the spoliation of relevant documents favorable to Plaintiff and for violating Magistrate Judge Burkhardt's July 3, 2014 Order. The Court finds Plaintiff was prejudiced by the destruction and late production of documents, and further finds that the tardy production of documents has not fully cured the prejudice to Plaintiff. The Court also finds that Defendants' destruction of documents and failure to timely provide ESI did not result from "the routine, good-faith operation of an electronic information system." *See* FED. R. CIV. P. 37(e).

### b.       Proposed Amended Rule 37

In anticipation of the amendment of Rule 37, the Court further finds that it would reach the same result under the proposed amended Rule 37. The proposed changes to Rule 37 are expected to take effect on

12cv2884-BAS-MDD

December 1, 2015, absent unforeseen circumstances.  Subsection (b) of Rule 37, under which this Court has analyzed this motion, is expected to remain unchanged.  But the new Rule 37(e) states:

> **(e)  Failure to Preserve Electronically Stored Information.**  If electronically stored information that should have been preserved in the anticipation or conduct of litigation is lost because a party failed to take reasonable steps to preserve it, and it cannot be restored or replaced through additional discovery, the court:
>
> > **(1)**  upon finding prejudice to another party from loss of the information, may order measures no greater than necessary to cure the prejudice; or
> >
> > **(2)**  only upon finding that the party acted with the intent to deprive another party of the information's use in the litigation may:
> >
> > > **(A)** presume that the lost information was unfavorable to the party;
> > >
> > > **(B)** instruct the jury that it may or must presume the information was unfavorable to the party; or
> > >
> > > **(C)** dismiss the action or enter a default judgment.

Proposed amended Rule 37(e) as submitted to Congress on April 29, 2015, after adoption by the U.S. Supreme Court, *available at* http://www.uscourts.gov/file/document/congress-materials (last accessed on June 16, 2015).

The new Rule 37 and its Advisory Committee Notes do not address the interplay of subsection (b) with subsection (e).  In this instance, subsection (b) would apply because Defendant and its attorneys violated Magistrate Judge Burkhardt's Order to produce the ESI at issue.

Even if subsection (e) applied instead of subsection (b), the Court would reach the same result on this record.  The Court has already found that Plaintiff was prejudiced by the destruction and delayed production of documents.  The Court further finds that Defendants intended to deprive Plaintiff of the use of the information the sales force deleted in response to Defendant Noorian's command.  Defendant Noorian asked for and commanded the deletion of these documents specifically because they were relevant to this lawsuit.  Accordingly, the Court finds Plaintiff has made a sufficient showing under the proposed amended Rule 37 to warrant the same sanctions that the Court finds, in the following section, are appropriate under the current Rule 37.

### 3. Sanctions

Sanctions imposed by the court "should be designed to: (1) deter parties from engaging in spoliation; (2) place the risk of an erroneous judgment on the party who wrongfully created the risk; and (3) restore the prejudiced party to the same position he would have been in absent the wrongful destruction of evidence by the opposing party." *West v. Goodyear Tire & Rubber Co.*, 167 F.3d 776, 779 (2d Cir. 1999).

Plaintiff requests various forms of sanctions.  Plaintiff does not seek the most extreme type of relief: an outright entry of judgment

67

12cv2884-BAS-MDD

against Defendants. Plaintiff also does not seek the least extreme type of relief: the re-opening of discovery. The Court has considered the various types of sanctions Plaintiff seeks, and finds that monetary sanctions, issue sanctions, and an adverse inference instruction are appropriate, as set forth below.

### a. Monetary Sanctions

As provided by current Rule 37(b)(2)(C), the Court is required to impose reasonable expenses, including attorney' fees, upon "the disobedient party, the attorney advising that party, or both." The Court must impose costs unless the failure to comply with the court order was "substantially justified or other circumstances make an award of expenses unjust." *Id*. Similarly, Rule 26(g)(3) requires an award of reasonable fees and costs.

The Court finds that sanctions must be imposed against Defendant RFT (the disobedient party) and the LeClairRyan LLP firm and Thomas O'Leary personally under Rule 37.[5] The Court further finds that sanctions must be imposed against Defendants Noorian, RFT, and attorney Thomas O'Leary under Rule 26(g)(3).

Due to the duration, frequency and severity of the discovery abuses, tracing the direct causal link between the pervasive misconduct and the fees and costs incurred is not possible. *See Chambers, supra*, 501 U.S. at 56; *Haeger, supra*, --F.3d-- at 26-38. The Court will award compensatory sanctions in the form of all attorneys' fees and costs

---

[5] Rule 37 sanctions will not be imposed on Noorian. *See*, n.4, above.

68

1   incurred by Plaintiff in seeking discovery from Defendants from October

2   18, 2013, when Defendant served its first discovery responses

3   containing false certifications, to date.  Because the Defendants'

4   discovery was intentionally flawed from the beginning, the Court is

5   imposing all monetary sanctions concurrently under both Rule 26(g)(3)

6   and Rule 37.  Each disciplinary authority is independently sufficient to

7   warrant the full extent of monetary sanctions imposed.  The Court will

8   determine the amount and apportionment of the award by separate

9   order following receipt of the necessary information from counsel for

10  Plaintiff.

11        **b. Contempt**

12        Plaintiff also seeks a finding of contempt against Defendants

13  based on their failure to comply with Magistrate Judge Burkhardt's

14  July 3, 2014, Order.  In this request, Plaintiff appears to be seeking civil

15  (*i.e.*, coercive) rather than criminal (*i.e.*, punitive) contempt.  (*See* ECF

16  No. 288 at 39:23 (relying on the standard for finding civil contempt)).

17  The Court agrees with Plaintiff that Defendant RFT violated

18  Magistrate Judge Burkhardt's specific and definite Order, that

19  Defendant RFT did not take every reasonable step to comply with that

20  order, and that compliance was possible.  Nevertheless, the Court is not

21  persuaded that Defendant Noorian can be held in contempt for violating

22  the Order requiring Defendant RFT to complete its production.  The

23  Court is also not persuaded that either Defendant has the ability to

24  satisfy a civil contempt order requiring them to produce additional

25  documents.

12cv2884-BAS-MDD

1    To the extent that Plaintiff's request is geared towards coercing
2    the production of the missing documents, the filing of the motion has
3    had the intended effect.  In addition, Plaintiff has not shown that
4    Defendants have the ability to comply with a contempt order crafted to
5    coerce further production of documents.  If, as it appears, Defendants
6    destroyed documents, then Defendants have no ability to produce the
7    destroyed documents.  Thus, a coercive contempt order would be
8    inappropriate with respect to the destroyed documents.

9        The Defendants also argue that all missing documents have now
10   been produced.  If true, Defendants lack the ability to produce more
11   documents.  The Court is wary of Defendants' claim that there are no
12   more documents to produce, given this record.  But Plaintiff has not met
13   its burden to show that Defendant has relevant documents that
14   survived destruction and have not now been produced.

15       Accordingly, the Court finds a civil contempt finding
16   inappropriate.  Plaintiff's motion for a contempt certification from this
17   Court to the District Judge is **DENIED**.

18       **c.** **Report and Recommendation for Issue Sanctions**
19           **and Adverse Inference Instruction**
20               **i.** **Introduction**
21       This Report and Recommendation is submitted to United States
22   District Judge Cynthia Bashant pursuant to 28 U.S.C. §636 and Local
23   Civil Rule 72.1(c) of the United States District Court for the Southern
24   District of California.  In this Report and Recommendation, this Court
25   **RECOMMENDS** that the district court **GRANT** Plaintiff's request for

70

issue sanctions and an adverse inference instruction against Defendants if the settlement is not finalized and the matter proceeds to trial.

The Court has considered whether lesser sanctions are sufficient, and finds they are not. Specifically, Magistrate Judge Burkhardt already imposed monetary sanctions on Defendant RFT for failure to comply with a discovery order concerning these documents. The imposition of monetary sanctions had, at best, a fleeting effect on Defendants and their attorneys. Moreover, the imposition of monetary sanctions alone will not cure the prejudice to Plaintiff.

## ii.  **Issue Sanctions**

The Court **RECOMMENDS** finding that Plaintiff's requested issue sanction in the form of a finding that the Report is false is appropriate. Plaintiff has shown that the spoliated documents relate to RFT's creation of the Report and show that it was not an internal report prepared by Plaintiff. Because Defendants destroyed the documents that they knew related directly to Plaintiff's claims after (and because) this case was filed, the parties and the Court cannot review the contents of the destroyed documents. Therefore, it is appropriate to transfer the risk of uncertainty from Plaintiff to Defendant as to whether the destroyed documents included a party admission by RFT that the Structural Failures Report was false.

The Court further finds sufficient grounds for establishing as a fact that Defendants fabricated the average rate of repair and lifetime

71

cost of the ION IQ as presented in materials created by Defendants, and did so with knowledge that the figures had no reliable basis.

Accordingly, this Court **RECOMMENDS GRANTING** Plaintiff's motion to establish as a fact that the Structural Failures Report is false, and that Defendants fabricated the average rate of repair and lifetime cost figures.

### iii.  Adverse Inference Instruction Standard

Adverse inference instructions are appropriate when a party destroys evidence or refuses to timely produce documents. *Residential Funding Corp, v. DeGeorge Fin. Corp.*, 306 F.3d 99, 107 (2d Cir. 2002); *but see* Committee Note to proposed new Rule 37(e)(2) (rejecting *Residential Funding* on other grounds).  Specifically, Plaintiff requests "an adverse inference instruction that (1) relevant documents Defendants failed to timely produce, or to produce at all, are harmful to Defendants, and (2) Defendants were aware of the falsity of the Structural Failures document and the average repair rate information, and encouraged distribution of the same."  (ECF No. 288 at 39:16-20).

The Court finds that the first instruction requested is warranted. The majority of courts, including many courts in the Ninth Circuit, apply "the three-part test set forth in *Zubulake v. UBS Warburg*, LLC, 220 F.R.D. 212, 216 (S.D. N.Y. 2003), for determining whether to grant an adverse inference spoliation instruction." *Apple v. Samsung*, 881 F.Supp.2d 1132, 1138 (N.D. Cal. 2012) ("*Apple I*"); *Lewis v. Ryan*, 261 F.R.D. 513, 518 (S.D. Cal. 2009); *Zest IP Holdings, LLC v. Implant Direct Mfg., LLC*, No. CIV. 10-0541-GPC WVG, 2013 WL 6159177, at *5

1  (S.D. Cal. Nov. 25, 2013), report and recommendation adopted in part,

2  No. CIV. 10-541-GPC WVG, 2014 WL 6851607 (S.D. Cal. June 16,

3  2014).

4          In *Zubulake IV*, the court stated:

5                  A party seeking an adverse inference instruction

6          (or other sanctions) based on the spoliation of evidence

7          must establish the following three elements: (1) that the

8          party having control over the evidence had an obligation

9          to preserve it at the time it was destroyed; (2) that the

10         records were destroyed with a 'culpable state of mind'

11         and (3) that the evidence was 'relevant' to the party's

           claim or defense such that a reasonable trier of fact

           could find that it would support that claim or defense.

12  *Zubulake IV*, 220 F.R.D. at 220 (citing *Residential Funding Corp. supra*,

13  306 F.3d at 108); *see also Apple II*, 888 F.Supp.2d at 989–90; *but see*

14  Advisory Committee Notes to proposed new Rule 37(e)(2) (rejecting

15  cases such as *Residential Funding* "that authorize the giving of adverse-

16  inference instructions on a finding of negligence or gross negligence.").

17      "When evidence is destroyed in bad faith, that fact alone is

18  sufficient to demonstrate relevance." *Zubulake IV, supra*, 220 F.R.D. at

19  220. "By contrast, when the destruction is negligent, relevance must be

20  proven by the party seeking the sanctions." *Id.*

21      Under current Rule 37, to find a "culpable state of mind," a court

22  need only find that a spoliater acted in "conscious disregard" of its

23  obligations to not destroy documents. *Apple II*, 888 F.Supp.2d at 989–

24  990, (citing *Hamilton v. Signature Flight Support Corp.*, 2005 WL

25  3481423, at *7 (N.D. Cal. 2004); *Io Group v. GLBT, Ltd.*, 2011 WL

73

1    4974337, at *7 (N.D. Cal. 2011)).  Where, however, a non-spoliating

2    party fails to show a degree of fault and level of prejudice, negligent

3    destruction of documents does not warrant an adverse inference

4    instruction or evidence preclusion.  *Apple II*, 888 F.Supp.2d at 993.

5         If spoliation is shown, the burden of proof shifts to the guilty party

6    to show that no prejudice resulted from the spoliation, because that

7    party "is in a much better position to show what was destroyed and

8    should not be able to benefit from its wrongdoing."  *Apple II*, 888

9    F.Supp.2d at 998 (citing *Hynix Semiconductor v. Rambus*, 591

10   F.Supp.2d 1038, 1060 (N.D. Cal.2006), *vacated on other grounds in* 645

11   F.3d 1336 (D.C. Cir. 2011)); *In re Hitachi*, 2011 WL 3563781, at *6.

12                **iv.  Analysis re Adverse Inference Instruction**

13        As explained earlier in this Order, the Court finds that spoliation

14   of evidence that Defendants controlled occurred after the duty to

15   preserve it arose and that Defendants acted with a culpable state of

16   mind.  Plaintiff is prejudiced by the destruction of the Structural

17   Failures Report related documents, because the contents of these

18   documents are directly relevant to showing lost sales with respect to the

19   trade libel and unfair competition claims at issue in this litigation.  As a

20   result, Plaintiff is now forced to go to trial while relying on incomplete

21   evidence.

22        Defendants attempt to rebut the presumption of prejudice by

23   stating that they produced all of the documents that were missing as a

24   result of errors, that Plaintiff has not shown that any specific emails or

25   documents are still missing, and that any documents that were

destroyed were merely "copies" of the Structural Failures Report that Plaintiff already has.  None of these contentions actually rebut the presumption.  Defendants' assumption that the employees only deleted identical copies of the Structural Failures Report is unsupported conjecture.  Defendants did not offer any forensic evidence to support their position.  Further, Plaintiff has pointed to the incomplete zip file and missing documents captured in the five screen shots.  It is not possible for Plaintiff to point to additional specific documents that were destroyed precisely because Defendants destroyed them before Plaintiff could review them.  Plaintiff has submitted sufficient evidence for this Court to determine that documents relevant to the claims in this action were destroyed because of Defendants' culpable conduct.

## v.  Recommended Adverse Inference Instruction

As a sanction for Defendants' spoliation of relevant evidence, the Court **RECOMMENDS GRANTING** Plaintiff's motion that an adverse inference instruction should be read to the jury.  An adverse inference instruction for spoliation of evidence can take many forms, ranging in degrees of harshness.  *Pension Comm., supra,* 685 F.Supp.2d at 470–71.  Based on Defendants' intentional deletion of documents it knew to be relevant, the Court **RECOMMENDS** that the jury be instructed as follows:

> Defendants, after learning that Plaintiff had sued Defendant RFT, destroyed relevant evidence for Plaintiff's use in this litigation.  The deleted evidence pertains to the creation and distribution of the Structural Failures Report

12cv2884-BAS-MDD

and the average repair rate of Plaintiff's products, which pertains to Plaintiff's unfair competition and trade libel claims.

You should presume from that destruction that the evidence destroyed was relevant to Plaintiff's case and that the destroyed evidence was favorable to Plaintiff.

You may, if you deem appropriate, take the destruction of documents into account in assessing the elements of Defendants' intent and knowledge, of whether the Structural Failures Report or average repair rate information were a substantial factor in causing Plaintiff damage, whether Plaintiff was damaged, and the amount of damage Plaintiff suffered.

*See E.I. du Pont de Nemours and Co. v. Kolon Indus., Inc.*, 803 F.Supp.2d 469, 509 (E.D. Va. 2011); *Food Service of America, Inc. v. Carrington*, No. CV-12-00175-PHX-GMS, 2013 WL 4507593, at *22 (D. Ariz. Aug. 23, 2013); *Chamberlain v. Les Schwab Tire Center of California*, No. 2:11-CV-03105-JAM, 2012 WL 6020103 at *6 (E.D. Cal. Dec. 3, 2012); *Zest IP Holdings, LLC, supra*, 2013 WL 6159177, at *5.

## Conclusion

In conclusion, the Court **GRANTS** in part and **DENIES** in part Plaintiff's request for sanctions, and **DENIES** Plaintiff's request for a certification of contempt findings.

Specifically, the Court **GRANTS** Plaintiff's request for reasonable attorneys' fees and costs incurred as a result of Defendants' discovery

misconduct, pursuant to Rules 26(g)(3) and 37. The Court will award compensatory sanctions that represent all reasonable fees and costs Plaintiff incurred in collecting discovery from Defendants from October 18, 2013 to date. The Court will determine the amount and apportionment of the award by separate order. Plaintiff must file a motion for attorneys' fees and costs within fourteen (14) days of the date of this Order. The motion should contain the necessary documentation and declarations regarding costs and fees. *See* ECF 185 at 16; *Blum v. Stenson*, 465 U.S. 886, 895 n.11 (1984); *Haeger v. Goodyear Tire and Rubber Co.*, Case No. 2:05-cv-02046-ROS, ECF No. 1125 (D. Ariz. August 26, 2013). Defendants and counsel may file an opposition to the fees motion no later than fourteen (14) days following the filing of the motion.

In the event that the parties do not finalize their noticed settlement, the Court further **RECOMMENDS** that the district judge issue an order: (1) **ADOPTING** the Report and Recommendation contained in this Order, (2) **GRANTING** Plaintiff's motion for an issue sanction against Defendants that the Structural Failures Report is false and an issue sanction that the Defendants fabricated the HME ION IQ average rate of repair and lifetime cost figures in sales materials, and did so with knowledge that the figures had no reliable basis, and (3) **GRANTING** Plaintiff's request for the adverse inference as recommended herein. Any objections to the Report and Recommendation contained in this Order must be filed with the district court judge within 14 days of a notification from the parties that their

77

1   noticed settlement did not come to pass. FED. R. CIV. P. 72(a); CIV. L.R.

2   72.1(b). The parties are advised that failure to file objections within the

3   specified time may waive the right to raise those objections on appeal of

4   the court's order. *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).

5        In addition, any party objecting to this Order or the Report and

6   Recommendation in this Order is **ORDERED** to deliver to the district

7   judge's chambers a complete set of the papers relating to this motion,

8   included docket entries cited in this Order, in fully-tabbed, well-

9   organized binders within one business day of the date the party files

10  their objections.

11

12       **IT IS SO ORDERED.**

13

14

15  Dated:   August 7, 2015

16                                         Hon. Mitchell D. Dembin
17                                         United States Magistrate Judge

18

19

20

21

22

23

24

25